UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
——————————————————————X

ALLSTATE INSURANCE COMPANY, ALLSTATE
INDEMNITY COMPANY, ALLSTATE PROPERTY &
CASUALTY INSURANCE COMPANY, AND
ALLSTATE FIRE & CASUALTY INSURANCE
COMPANY,

Docket No.: 25-cv-6004

**COMPLAINT**

                              Plaintiff(s),

**Plaintiffs Demand a Trial by Jury**

       -against-

JEFFREY I. KRIEGEL, DPM, JEFFREY I. KRIEGEL,
DPM A/K/A DR. JEFFREY KRIEGEL (AS A SOLE
PROPRIETORSHIP), WILLIAM MICHAEL LEVINE,
DPM, WILLIAM LEVINE, DPM A/K/A DR. WILLIAM
LEVINE (AS A SOLE PROPRIETORSHIP), AND JOHN
DOE DEFENDANTS 1-10,

                         Defendant(s).
——————————————————————X

1

## TABLE OF CONTENTS

Complaint ........................................................................................................................ 4

Introduction .................................................................................................................... 4

THE PARTIES ................................................................................................................ 9

   I.    Plaintiffs ............................................................................................................. 9

   II.   Defendants ......................................................................................................... 9

      A.   William Michael Levine ............................................................................. 9

      B.   William Levine, DPM A/K/A Dr. William Levine (As A Sole Proprietorship) .......... 10

      C.   Jeffrey I. Kriegel ...................................................................................... 10

      D.   Jeffrey I. Kriegel, DPM A/K/A Dr. Jeffrey Kriegel (As A Sole Proprietorship) ......... 10

      E.   John Doe Defendants ................................................................................ 11

Jurisdiction and Venue .................................................................................................. 11

ALLEGATIONS COMMON TO ALL CLAIMS ......................................................... 12

   I.    Applicable Laws and Regulations ................................................................... 12

      A.   New York's Laws Pertaining to Medical Licensing and No-Fault Reimbursement .... 12

      B.   Services Provided by Independent Contractors Are Not Reimbursable Under the No-Fault Laws ...................................................................................... 16

      C.   Laws Pertaining to Racketeer Influenced and Corrupt Organizations ("RICO") ......... 17

   II.   The Fraudulent Scheme ................................................................................... 18

      A.   The Unlawful Recruitment of Levine and Kriegel ..................................... 18

      B.   Levine and Kriegel Cede Control of The Podiatry Providers to the John Doe Defendants ......................................................................................... 19

      C.   Common Unlawful Operations of the Podiatry Providers ........................... 21

      D.   Gaining Access to Insureds Through Unlawful Kickback and Referral Agreements .. 23

      E.   Fraudulent Charges for Initial Consultations ............................................. 28

      F.   Defendants Fraudulent Billing for Shockwave and PENs ........................... 43

      G.   Fraudulent Billing for Supplies ................................................................. 62

      H.   Fraudulently Charges for Services Performed by Non-Physicians Independent Contractors. .......................................................................... 65

   III.  The Fraudulent Charges the Defendants Submitted or Caused to be Submitted to Allstate 69

   IV.  Defendants' Fraudulent Concealment and Allstate's Justifiable Reliance ........ 70

AS AND FOR A FIRST CAUSE OF ACTION ............................................................ 72

AS AND FOR A SECOND CAUSE OF ACTION...................................................... 75

AS AND FOR A THIRD CAUSE OF ACTION........................................................ 77

AS AND FOR A FOURTH CAUSE OF ACTION..................................................... 79

AS AND FOR A FIFTH CAUSE OF ACTION.......................................................... 81

AS AND FOR A SIXTH CAUSE OF ACTION ......................................................... 83

AS AND FOR A SEVENTH CAUSE OF ACTION.................................................... 84

AS AND FOR AN EIGHTH CAUSE OF ACTION.................................................... 86

AS AND FOR A NINETH CAUSE OF ACTION ...................................................... 88

AS AND FOR A TENTH CAUSE OF ACTION........................................................ 90

AS AND FOR AN ELEVENTH CAUSE OF ACTION ............................................. 90

DEMAND FOR RELIEF........................................................................................... 92

## COMPLAINT

Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company (collectively, "Allstate" and/or "Plaintiffs"), by their attorneys, the Law Offices of Camille Nanni as and for their Complaint against Defendants Jeffrey I. Kriegel, DPM,  Jeffrey I. Kriegel, DPM a/k/a Dr. Jeffrey Kriegel (as a sole proprietorship), William Michael Levine, DPM, William Levine, DPM a/k/a Dr. William Levine (as a sole proprietorship) and John Doe Defendants "1"-"10" (collectively, referred to hereinafter as the "Defendants"), alleges as follows:

## INTRODUCTION

1.      This case involves podiatric physicians, unlicensed laypersons, and sham medical professional practices, who together, systematically and repeatedly violated, and continue to violate, New York and federal laws, as part of an elaborate scheme to defraud Allstate and other New York No-Fault insurers. In furtherance of this scheme, the Defendants submitted, or caused to be submitted to Allstate, hundreds of claims for podiatry services that were medically unnecessary and were unlawfully rendered to the extent that they were rendered at all (hereinafter referred to as the "Fraudulent Scheme").

2.      This egregious scheme was purposefully designed to deceive patients and insurers into believing that the medical services provided were being rendered by licensed doctors of podiatric medicine, acting in the best interest of the patients' health.

3.      In reality, the patients were inventory and were systematically subjected to reckless, dangerous, and/or medically unnecessary treatment, to the extent any treatment was rendered at all.

4.      The scheme was orchestrated by the John Doe Defendants, who are unlicensed laypersons prohibited by New York law from owning, controlling, or operating a professional healthcare practice.

5.      The John Doe Defendants designed the scheme to circumvent New York law and exploit the No-Fault Insurance system. The nature of the healthcare fraud scheme described herein is all too common in New York and has plagued the No-Fault system.

6.      To effectuate the Fraudulent Scheme, in or around 2023, the John Doe Defendants recruited licensed New York podiatrists, William Michael Levine ("Levine") and Jeffrey Kriegel ("Kriegel") who, in exchange for payment, each agreed to establish an unincorporated podiatry practice using their name and credentials.

7.      The Levine sole proprietorship (the "Levine Practice") and the Kriegel sole proprietorship (the "Kriegel Practice") (together, referred to hereinafter as the "Podiatry Providers") were sham practices, under the control of the John Doe Defendants and organized at their direction solely to submit fraudulent healthcare claims to Allstate and other No-Fault insurers.

8.      The Podiatry Providers operated in a materially identical manner, which included, among other things, billing for the same bogus medical services supported by the same fraudulent treatment records. By submitting the fraudulent claims through distinct tax identification numbers, ostensibly individually controlled by Levine and Kriegel, the Defendants knowingly acted to conceal the scale of the Fraudulent Scheme and attempted to stay under the radar of insurers.

9.      To secure "patients" for the Podiatry Providers, the Defendants established improper and illegal referral arrangements within at least (16) multi-disciplinary No-Fault clinics. Pursuant to these arrangements, the Defendants received a steady stream of patients whose insurance policies could be used to bill Allstate and other insurers.

10.     After receiving illegal access to the patient bases at the No-Fault clinics, Kriegel and Levine purported to personally conduct a podiatry consultation of each patient. The consultations were fraudulently performed and used to establish fictitious patient histories which virtually always included phony chronic podiatric injuries from a motor vehicle accident ("MVA"), that had failed to respond to conventional treatment.

11.     The false diagnoses of podiatric injuries were then used to justify Defendants' billing for experimental treatments styled by the Podiatry Providers as "Extracorporeal Shockwave a/k/a Radial Pressure Wave" (*hereinafter* "Shockwave") and "Percutaneous Electrical Neurostimulation a/k/a Biowave PENs" (*hereinafter* "PENS") (together with the consultations, the "Fraudulent Services"). The billing submitted, or caused to be submitted, by the Defendants for the Fraudulent Services uniformly used specific Current Procedural Terminology "CPT" codes that misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Allstate.

12.     The false podiatric injuries were also used by the Defendants as the basis to prescribe medical supplies reputed to be custom molded foot orthotics that were billed to Allstate by medical suppliers, who upon information and belief, were controlled by the John Doe Defendants.

13.     The Defendants further falsified billing and treatment records to deceive insurers that the Fraudulent Services were being rendered by Levine or Kriegel personally, when, upon information and belief, the services, to the extent rendered at all, were rendered by unlicensed technicians not qualified to practice podiatric medicine.

14.     Through the U.S. Mail, the Defendants submitted, or caused to be submitted to Allstate, fraudulent billing amounting to over $705,385.09 for fraudulent podiatry services

ostensibly rendered to Allstate insured patients injured in motor vehicle accidents. (hereinafter, "Insureds").

15.     As a result of the fraudulent submissions, Allstate wrongfully paid $86,176.77 to the Podiatry Providers for illusory, medically unnecessary, and otherwise non-reimbursable healthcare services.

16.     The John Doe Defendants, Levine, and Kriegel joined together in a purposeful and organized manner, with everyone fulfilling a specific and necessary role to facilitate this wide ranging, extensive healthcare fraud scheme. In a period of eighteen (18) months, the Podiatry Providers went from non-existent to thriving podiatric medical groups operating from sixteen offices throughout the metropolitan New York area.

17.     At all relevant times discussed herein:

(i)     The John Doe Defendants operated, managed and controlled the Podiatry Providers, in violation of New York law;

(ii)    Levine intentionally misrepresented and concealed facts related to his operation, management and control of the Levine Practice;

(iii)   Kriegel intentionally misrepresented and concealed facts related to his operation, management and control of the Kriegel Practice;

(iv)    The Defendants schemed to, and did subject Insureds to medically unnecessary and unproven treatment(s) designed for no other purpose than to defraud Allstate and other insurers;

(v)     The Defendants procured patients through unlawful referral arrangements;

(vi)    The Defendants intentionally misrepresented that Levine or Kriegel performed the Fraudulent Services when in fact, to the extent they were performed at all, they were performed by non-physician independent contractors.

(vii)   Through the U.S. Mail, the Defendants submitted, or caused to be submitted, to Allstate in excess of three hundred fraudulent healthcare claims.

18.    The chart annexed as *Exhibit 1* sets forth a representative sample of the fraudulent charges that the Defendants submitted, or caused to be submitted, to Allstate through the Podiatry Providers.

19.    The chart annexed as *Exhibit 2* sets forth representative examples of mail fraud arising from the Defendants use of the U.S. Mail in furtherance of the Fraudulent Scheme.

20.    Allstate brings this action pursuant to:

(i)    The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and (d), and 1964(c);

(ii)    New York State common law claims of fraud and unjust enrichment; and

(iii)   The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

21.     This action seeks actual damages currently in excess of $86,176.77, the exact amount to be determined at trial, representing insurance payments that were wrongfully obtained from Allstate by, or on behalf of, the Podiatry Providers, as a direct result of the Defendants' unlawful conduct and material misrepresentations.

22.    Allstate also seeks a declaration pursuant to 28 U.S.C. §§ 2201-2202, that it is not legally obligated to pay or reimburse the Podiatry Providers (or their agents) in connection with any past medical claims, currently amounting to in excess of $619,208.32, the exact amount to be determined at trial, or any future claims seeking payment under New York's No-Fault laws because, at all relevant times:

(i)    The Podiatry Providers were unlawfully operated, managed, and controlled by the John Doe Defendants, in violation of the New York Business Corporation Law.

(ii)    The medical services provided by the Podiatry Providers to Allstate insureds, to the extent provided at all, were excessive, medically unnecessary, and rendered according to pre-determined treatment protocols that were not based on medical decision-making but were designed solely to financially enrich the Defendants.

8

      (iii)   The claim forms submitted to Allstate by (or on behalf of) the Podiatry Providers fraudulently and materially misrepresented the nature and extent of the healthcare services that were provided to Allstate insureds to wrongfully inflate charges.

      (iv)   The Podiatry Providers procured Allstate insureds through unlawful referral arrangements.

      (v)   The Podiatry Providers claim forms fraudulently misrepresented that Levine or Kriegel provided the services when in fact, to the extent they were provided at all, the services were provided by non-podiatrist independent contractors who were not employed by Levine or Kriegel.

## THE PARTIES

### I.   Plaintiffs

23.    Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois.

24.    Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company each have their principal place of business in Northbrook, Illinois.

25.    At all relevant times to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company and Allstate Fire & Casualty Insurance Company were each authorized to conduct business in New York.

### II.   Defendants

#### A.  William Michael Levine

26.    Defendant, Levine, resides in and is a citizen of New York. Levine was licensed to practice podiatric medicine in New York on October 14, 1992, serves as the record owner of the Levine Practice, and purports to perform the Fraudulent Services.

9

27.     Levine permitted the John Doe Defendants to use his name, license, and credentials to operate, manage, and control the Levine Practice as part of the Fraudulent Scheme to defraud Allstate and other New York automobile insurers.

**B.  William Levine, DPM A/K/A Dr. William Levine (As A Sole Proprietorship)**

28.     Defendant, the Levine Practice is an unincorporated podiatry practice using a tax identification number corresponding to Levine's name and license, and purports to be operated, managed and controlled by Levine.

29.     Since 2023, the Levine Practice has been used by Levine and the John Doe Defendants to submit fraudulent billing to Allstate.

**C.  Jeffrey I. Kriegel**

30.     Defendant, Kriegel, resides in and is a citizen of New York. Kriegel was licensed to practice podiatric medicine in New York on March 13, 1989, serves as the record owner of the Kriegel Practice, and purports to perform the Fraudulent Services.

31.     Kriegel permitted the John Doe Defendants to use his name, license, and credentials to operate, manage, and control the Kriegel Practice as part of the Fraudulent Scheme to defraud Allstate and other New York automobile insurers.

**D.  Jeffrey I. Kriegel, DPM A/K/A Dr. Jeffrey Kriegel (As A Sole Proprietorship)**

32.     Defendant, the Kriegel Practice, is an unincorporated podiatry practice using a tax identification number corresponding to Kriegel's name and license, and purports to be operated, managed and controlled by Kriegel.

33.     Since 2023, the Kriegel Practice has been used by Kriegel and the John Doe Defendants to submit fraudulent billing to Allstate.

### E.  John Doe Defendants

34.    Upon information and belief, the John Doe Defendants are unlicensed, non-professional individuals and/or entities, presently not identifiable to Allstate, who knowingly conspired, participated, conducted, and assisted in the Fraudulent Scheme with Levine, Kriegel and the Podiatry Providers.

35.    Upon information and belief, the John Doe Defendants exerted control over the day-to-day operations and management of the Podiatry Providers by, among other things, controlling their finances, patient referrals and treatments, and by referring the billing and collection work for the Fraudulent Services to the No-Fault collection attorney.

36.    These individuals will be added as Defendants when their names and the extent of their participation become known through discovery.

## JURISDICTION AND VENUE

37.    28 U.S.C. § 1331 grants this Court jurisdiction over claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §§ 1961 et seq., because they arise under the laws of the United States.

38.    28 U.S.C. § 1332(a)(1) confers subject matter jurisdiction upon this Court because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is a matter between citizens of different states.

39.    This Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

40.    Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367, and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary Defendant.

41.     Furthermore, 28 U.S.C. § 1391 allows venue in this District to be appropriate, as the Eastern District of New York is the district where one or more of the Defendants reside and because this is the District in which a substantial part of the events giving rise to Allstate's claims against the Defendants occurred.

<u>**ALLEGATIONS COMMON TO ALL CLAIMS**</u>

42.     Allstate underwrites automobile insurance in the State of New York.

I.     <u>**Applicable Laws and Regulations**</u>

A.  **New York's Laws Pertaining to Medical Licensing and No-Fault Reimbursement**

i.     **New York's No-Fault Insurance System**

43.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, <u>et seq</u>.), and regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, <u>et seq</u>.)(collectively, "the No-Fault laws"), automobile insurers such as Allstate are required to pay first-party benefits to reimburse for basic economic loss ("No-Fault Benefits"), sustained by an eligible injured person on account of personal injuries caused by an accident arising out of the use or operation of a motor vehicle.

44.     Basic economic loss is defined to include necessary expenses of medical and healthcare services up to $50,000 per person.

45.     An Insured may assign their rights to No-Fault Benefits to providers of healthcare services in exchange for those services.

46.     Following a duly executed assignment, a healthcare provider may submit claims directly to the insurance company using the claim form entitled "Verification of Treatment by Attending Physician or Other Provider of Health services," ("NF-3 Claim Form"). In the

alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration Insurance Claim form ("HCFA-1500 Form").

47.     The No-Fault laws provide that insurers pay claims for medical services directly to the healthcare provider promptly and in accordance with established fee schedules governed by the New York Workers Compensation Fee Schedule ("Fee Schedule").

48.     The Fee Schedule Adopts the AMA Current Procedural Terminology Book reporting rules which in turn instruct the use of the AMA CPT Assistant ("CPT Assistant") to verify the intent of a CPT code when reporting a services

49.     When a healthcare provider submits a claim for No-Fault Benefits using the Current Procedural Terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that was used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the services described by the specific CPT code that was used was reasonable and medically necessary; and (iii) the service and the attendant fees were not excessive.

50.     Pursuant to New York Insurance Law § 403, the NF-3 Claim Forms submitted by a healthcare provider to Allstate, and to all other automobile insurers, must be verified by the healthcare provider, subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other persons files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act which is a crime.

### ii.     New York's Prohibition of Lay Ownership of Professional Healthcare Practices

51.     In New York, only licensed professionals, such as podiatrist, may organize, own, or control a professional healthcare corporation. See, e.g., New York Business Corporation Law

§§ 1503 and 1508. Likewise, only licensed professionals may be a director or officer of a professional corporation. See New York Business Corporation Law § 1508. Additionally, New York law requires that professional owners of a professional service corporation be engaged in the practice of medicine through the entity. See New York Business Corporation Law § 1507(a).

52.    Pursuant to the New York Education Law, it is professional misconduct to permit laypersons to share in the fees for professional medical services. See New York Education Law § 6530(19).

53.    Moreover, it is a crime in New York to practice medicine without a license and/or to aid or abet a person to practice medicine without a license. See e.g., New York Education Law § 6521.

54.    Taken together, the restrictions set forth under the No-Fault laws, Education Law, and the Business Corporation law are designed to ensure that professional services entities are operated and controlled by individuals that are authorized to practice in the professional disciplines offered by the entity.

### iii.    New York's Prohibitions Against Improper Referrals

55.    The New York Public Health Law and its corresponding regulations promulgated by the Department of Health prohibit a practitioner from ordering enumerated services, including pharmacy, imaging, and physical therapy services, when the referring provider has a financial relationship with the provider performing the service. See e.g., New York Public Health Law § 238(a)(1)(a) and 10 N.Y.C.R.R. § 34-1.3.

56.    The same laws and regulations prohibit referrals for any other "health or health related items" where a financial relationship exists unless the financial relationship is disclosed to the patient and the patient is informed of their right to use alternative healthcare providers for the

services. See e.g., New York Public Health Law § 238(d) and 10 NYCRR § 34-1.5.

57.    Additionally, the New York Education Law prohibits physicians from requesting, agreeing to receive, or participating in payments or other forms of consideration, in exchange with the furnishing of professional care. See e.g. Education Law §§ 6509 and 6531(18); 8 N.Y.C.R.R. § 29.1 (b)(3).

### iv.    Services Rendered in Violation of the New York Law are Not Reimbursable Under the No-Fault Laws

58.    The No-Fault laws expressly provide that, a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet *any* applicable New York State or local licensing requirements necessary to perform such services in New York. See 11 N.Y.C.R.R. § 65-3.16(a)(12)(emphasis added).

59.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005*)* and Andrew Carothers, MD, PC v. Progressive Ins. Co. 33 N.Y.3d 389, 406 (2019)*,* the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed individuals are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

60.    In Fair Price Med. Supply Corp. v. ELRAC Inc., 12 Misc. 3d 119, 820 N.Y.S.2d 679 (App. Term, 2d & 11th Jud. Dists. 2006) the New York Appellate Term, Second Department interpreted 11 NYCRR § 65-3.16(a)(12) to prohibit medical professionals who engage in improper referrals (e.g., kickbacks), in violation of the Public Health Law, from reimbursement for No-Fault Benefits.

61.    Accordingly, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, it if pays or receives unlawful kickbacks in

exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatment, and/or fails to abide by any other state or local licensing requirement required to perform such services in New York.

**B. Services Provided by Independent Contractors Are Not Reimbursable Under the No-Fault Laws**

62.    It is well established under the No-Fault laws that services provided by an independent contractor are not reimbursable.

63.    11 N.Y.C.R.R. 65-3.11(a) of the No-Fault Law provides:

> Direct Payments. (a) An insurer shall pay benefits for any element of loss, other than death benefits, *directly to the applicant*, or when appropriate, to the applicant's parent or legal guardian, or to any person legally responsible for necessities, or *upon assignment by the applicant* or any of the aforementioned persons, shall *pay benefits directly to providers of health care services.* (*Emphasis added*)

64.    The Department of Financial Services (formerly New York State Insurance Department) who is responsible for implementing the No-Fault Law and promulgated 11 N.Y.C.R.R. 65-3.11(a) has consistently opined that the regulation prohibits medical providers from billing insurers directly for services rendered by an independent contractor. See DOI Opinion Letters, February 21, 2001, February 5, 2002, March 11, 2002, October 29, 2003, and March 21, 2005.

65.    New York Courts have held consistent with the Insurance Department's interpretation holding that "an independent contractor…is not a provider of… services within the meaning of Section 65.15 (j)(1) (now 11 NYCRR 65.3.11(a) and is hence not entitled to recover direct payment of assigned No-Fault Benefits from the defendant insurer." A.B. Med. Servs., PLLC v. Liberty Mut. Ins. Co., 9 Misc. 3d 36, 37-38, 801 NYS2d 690 (App. Term, 2d & 11th Jud. Dists. 2005); See also Metroscan Imaging, P.C. v. GEICO Ins. Co., 13 Misc. 3d 35, 823 NYS2d

818 (App. Term, 2d & 11th Jud. Dists. 2006); Rockaway Boulevard Medical P.C. v. Progressive

Ins., 9 Misc3d 52, 54, 802 N.Y.S.2d 302 (App. Term, 2d & 11th Jud. Dists. 2005).

**C.  Laws Pertaining to Racketeer Influenced and Corrupt Organizations ("RICO")**

66.    The Organized Crime Control Act of 1970 was established in order to prevent and

punish racketeering activity. See 18 U.S.C. § 1962.

67.    Under 18 U.S.C. § 1962(c)-(d):

> (c) it shall be unlawful for any person employed by or associated with any
> enterprise engaged in, or the activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or indirectly, in the conduct of such
> enterprise's affairs through a pattern of racketeering activity or collection of
> unlawful debt.
> (d) It shall be unlawful for any person to conspire to violate any provisions of
> subsection (a), (b), or (c) of this section.

68.    An "enterprise," under 18 U.S.C. § 1961(4), "includes any individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals associated in

fact although not a legal entity[.]"

69.    Under 18 U.S.C. § 1964 (a) Civil Remedies:

> The district courts of the United States shall have jurisdiction to prevent and restrain
> violations of section 1962 of this chapter by issuing appropriate orders, including,
> but not limited to: ordering any person to divest himself of any interest, direct or
> indirect, in any enterprise; imposing reasonable restrictions on the future activities
> or investments of any person, including, but not limited to, prohibiting any person
> from engaging in the same type of endeavor as the enterprise engaged in, the
> activities of which affect interstate or foreign commerce; or ordering dissolution or
> reorganization of any enterprise, making due provision for the rights of innocent
> persons.

70.    In addition to providing a mechanism to counter criminal activities, the RICO

statute also establishes and provides for a private enforcement scheme for violations of the RICO

statute.

71.     18 U.S.C § 1964(c) states:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

72.      "Racketeering activity" is defined in 18 U.S.C. § 1961 and includes any act which is indictable under 18 U.S.C. § 1341 (relating to mail fraud).

73.     An individual or entity commits mail fraud when they:

having devised or intending to devise any scheme or artifice to defraud, or for obtaining money…by means of false or fraudulent pretenses, representations, or promises…for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing.

## II.   **The Fraudulent Scheme**

### A.  **The Unlawful Recruitment of Levine and Kriegel**

74.     Upon information and belief, the John Doe Defendants designed the framework of the Fraudulent Scheme prior to securing the participation of Levine or Kriegel. This included, but was not limited to, securing the kickback arrangements for patient access, pre-determining the medical services to be billed, and recruiting a No-Fault collection attorney to facilitate their control over the revenues generated by the practices. The final necessary step in executing the scheme was to recruit licensed podiatrists willing to participate in the scheme by providing their names, licenses, and signatures to be misappropriated and used by the John Doe Defendants to form podiatry practices facially permitted to bill No-Fault insurers.

75.     Levine was a perfect candidate for the Fraudulent Scheme based on his history of professional and legal struggles. Levine became licensed to practice podiatry in New York State on October 14, 1992. In 2010, Levine was criminally convicted of possession of controlled substances in the Third Degree, a class B felony and attempted criminal possession of a weapon in the Second Degree, a class D violent felony. As a result of the convictions, Levine entered a consent order in which his license to practice podiatric medicine was suspended on January 11, 2011.

76.     According to public records, Levine is listed as the owner of a separate and unrelated podiatric entity, which operates at a different location and provides services that are unrelated to those ostensibly rendered by the Levine Practice.

77.     According to public records, Kriegel is currently employed as a treating podiatrist in an unrelated podiatry group, where he renders podiatric treatment unrelated to the Fraudulent Services described herein.

78.     Although Kriegel and Levine were the record owners of the Podiatry Providers, they never operated, managed, or controlled the entities and never provided legitimate treatment through the practices.

**B.  Levine and Kriegel Cede Control of The Podiatry Providers to the John Doe Defendants**

79.     By virtue of their covert and unlawful control of the Podiatry Providers, the John Doe Defendants could not hold a direct financial interest in the practices. With that in mind, the John Doe Defendants established alternate means to exert control over the practices and their revenues.

80.     To effectuate control, and to cloak the illegal arrangements with a guise of legitimacy, upon information and belief, the John Doe Defendants arranged for the Podiatry

Providers to enter into a series of agreements styled as loans, funding, and billing agreements (collectively, the "Sham Agreements") with third-party entities that were controlled by the John Doe Defendants.

81.    Upon information and belief, the Sham Agreements served no legitimate purpose and were solely designed to give the John Doe Defendants complete control over the operations of the Podiatry Providers and the revenues generated by them. Kriegel and Levine agreed to the Sham Agreements in exchange for the financial consideration they received from the John Doe Defendants for their participation in the scheme.

82.    To guarantee that the Podiatry Providers issued payments pursuant to the Sham Agreements, the John Doe Defendants recruited a No-Fault collection attorney to serve as the "escrow agent" for the Podiatry Providers. Pursuant to the terms of the escrow agreement, all payments from Allstate to the Podiatry Providers were directed to the No-Fault collection attorney.

83.    After receipt of the insurer payments, the No-Fault collection attorney deposited and cleared Allstate's payments through their IOLA/Attorney trust account, and then upon information and belief, dispersed the funds to the John Doe Defendants pursuant to the terms of the Sham Agreements. Kriegel and Levine, upon information and belief, never had access to, or knowledge of, Allstate payments ostensibly rendered directly to their solely owned and controlled practices. This processing of insurer company payments was intended to obscure the money trail and permitted the John Doe Defendants to directly profit from Allstate's payments while concealing their identities.

84.    The use of an attorney intermediary also acted to obstruct insurer investigations and prohibit Allstate from verifying the legitimacy of the Podiatrist Providers. Virtually every claim submitted by the Podiatry Providers was accompanied by a letter from the No-Fault collection

attorney demanding that all communication, including claims verification, be directed to that attorney.

85.     Finally, Defendants retained a No-Fault collection attorney to initiate costly and time-intensive individual lawsuits and/or arbitration proceedings against Allstate and other insurers when their fraudulent claims were not promptly paid in full. These serial collection efforts, spanning numerous separate No-Fault proceedings over several years, are a critical component of the Fraudulent Scheme. Defendants rely on the impracticality of any single arbitrator or civil court judge, typically reviewing only one bill per case, to detect or address the broader, complex fraud scheme involving multiple professional entities operating across numerous clinics throughout the New York metropolitan area.

### C.  Common Unlawful Operations of the Podiatry Providers

86.     After securing Levine and Kriegel's participation, as well as the mechanisms to control the flow of revenue through the practices, the John Doe Defendants set forth to operate the Podiatry Providers in a materially identical manner, spreading the same fraudulent billing across each of their individual tax identification numbers. By submitting the billing under separate names, the John Doe Defendants attempted to keep exposure from any single entity low to evade detection and scrutiny from insurers.

87.     Although the Levine Practice and Kriegel Practice were supposedly separate entities, with separate owners, the two practices were commonly operated, managed, and controlled by the same John Doe Defendants in furtherance of the same healthcare fraud scheme.

88.     Kriegel and Levine's Practices operated without distinction, billing for the same Fraudulent Services using virtually identical medical records across every patient of each practice.

89.     As will be addressed in greater detail below, the commonalities between the Levine Practice and the Kriegel Practice included, but were not limited to:

(i)     Listing the same address - PO Box 090382, Brooklyn NY 11209 - on virtually every patient assignment of benefits form.

(ii)    Listing the same billing address on their NF-3 claim forms.

(iii)   Submitting bills using the same CPT codes.

(iv)    Assigning the same rates to the CPT codes and then justifying the related charges based on the virtually identical treatment reports.

(v)     Purporting to use the same wholesaler to purchase supplies related to the PENS treatment.

(vi)    Retaining the same No-Fault collection attorney.

(vii)   Submitting virtually identical treatment records for each patient, encompassing the same idiosyncrasies which included confusing Shockwave and PENS, and referring to themselves in the third person as "the Podiatrist".

(viii)  Alleging to perform "MFJ ROM" testing on virtually every patient, even though no such test exists in podiatry.

(ix)    Submitting the same templated report to document consultations.

(x)     Purporting to treat some of the same patients, at the same locations.

90.     Moreover, Kriegel purported to employ Levine even though Kriegel billed under his personal social security number and claimed to personally provide the services through the Kriegel Practice.

91.     The John Doe Defendants further used the Podiatry Providers to prescribe and provide a medical justification for the same customized "foot orthotic". The foot orthotics were allegedly dispensed and billed to Allstate by one of two entities: Jaxton Enterprises, LLC and Sandeve Medical Supplies LLC.

92.     Upon information and belief, Jaxton Enterprises, LLC and Sandeve Medical Supplies LLC are at the same address and are otherwise associated with MDX Solutions Group,

Inc., ("MDX"). MDX, along with its owner, has been implicated in a litany of civil and criminal fraud schemes.

93.    For example:

(i)    In *GEICO v. Strobeck,* GEICO alleged that MDX recruited, among other persons, physicians, attorneys, and the controllers of No-Fault Clinics to engineer a fraudulent scheme that resulted in more than $2.4 million of billing to GEICO for fraudulent Shockwave services.[1]

(ii)    In *GEICO v. Barakat,* GEICO alleged materially similar allegations against MDX for their role in a scheme that resulted in hundreds of thousands of dollars billed to GEICO for fraudulent Shockwave services.[2]

(iii)    The U.S. Attorney, Eastern District of New York, indicted the owner of MDX for using the entity to defraud the Paycheck Protection Program.[3]

94.    In conclusion, the Podiatry Providers were not separate entities, owned and operated by distinct professionals, but rather a carbon copy of one another acting as part of a single widespread healthcare fraud scheme orchestrated by the same John Doe Defendants.

**D.  Gaining Access to Insureds Through Unlawful Kickback and Referral Agreements**

95.    To perpetuate the Fraudulent Scheme, the Defendants entered into unlawful referral and kickback agreements to secure patients whose insurance policies could be used to bill for the Fraudulent Services. In exchange for the kickback payment, Insureds were directed to the Podiatry Providers and in turn, the Defendants submitted bills to Allstate for services supposedly rendered to those Insureds.

96.    The Fraudulent Scheme could not have been carried out without these unlawful referral arrangements as the Podiatry Providers had no legitimate patients of their own and as such, could not generate revenue by billing Allstate and other insurers for No-Fault Benefits.

---

[1] Gov't Emplees Co., et al. v. John Strobeck, M.D. et al., 22-cv-07477- (E.D.N.Y.).
[2] Gov't Emplees Co., et al. v. Jean Barakat M.D., et al., 22-cv-07532 (E.D.N.Y.).
[3] United States v. Noor 23-CR-368 (E.D.N.Y.).

97.     At all relevant times herein, the Podiatry Providers purported to operate exclusively on a transient basis within "No-Fault Clinics" located throughout the New York State metropolitan area.

98.     These No-Fault Clinics were medical mills established for the sole purpose of submitting inflated, fraudulent billing to Allstate and other insurers. Clinics similar in nature were identified by the Insurance Information Institute as the engine that drives No-Fault fraud and operate solely for the pecuniary benefit of their unlicensed lay owners.[4]

99.     The individual No-Fault Clinics obtained and controlled the patient bases. As part of the "pay for play" arrangement, the Podiatry Providers operated at the No-Fault Clinics on an itinerant basis and were fed patients without regard to the genuine medical needs of those patients.

100.     Specifically, the Defendants entered into illegal referral and kickback arrangements with the operators of at least sixteen No-Fault Clinics as follows:

| Clinic - Street Address | County | ZIP Code | Podiatry Provider |
|---|---|---|---|
| 2017-2019 Williamsbridge Road | Bronx | 10461 | Levine Practice |
| 2354 Westchester Avenue | Bronx | 10462 | Kriegel Practice |
| 115 Meacham Avenue | Queens | 11003 | Kriegel Practice |
| 2816 21st Street | Queens | 11102 | Levine Practice |
| 2673 Atlantic Avenue | Kings | 11207 | Kriegel Practice |
| 400 Rockaway Avenue | Kings | 11212 | Kriegel Practice |
| 486 McDonald Avenue | Kings | 11218 | Kriegel Practice |
| 245 Rockaway Avenue | Kings | 11233 | Levine Practice |
| 2460 Flatbush Avenue | Kings | 11234 | Kriegel Practice |
| 2422 Knapp Street | Kings | 11235 | Kriegel Practice |
| 79-45 Metropolitan Avenue | Queens | 11379 | Kriegel Practice, Levine Practice |
| 66-42 Myrtle Avenue | Queens | 11385 | Kriegel Practice |
| 102-28 Jamaica Avenue | Queens | 11418 | Kriegel Practice |
| 30 S Ocean Avenue | Nassau | 11520 | Levine Practice |
| 49 N Franklin Street | Nassau | 11550 | Levine Practice |
| 1026 Little East Neck Road | Suffolk | 11704 | Kriegel Practice, Levine Practice |

---

[4] https://www.iii.org/article/No-Fault-insurance-fraud-new-york-state-ramping-premiums.

101.    The Podiatry Providers purported to have medical offices in each location, however this was all a thinly veiled kickback scheme as the Podiatry Providers did not maintain any legitimate medical offices at any of the above referenced locations and made no legitimate attempts to attract patients or build a medical practice. For example:

(i)    The Podiatry Providers did not identify any of the office locations as their "Address of Provider" on patient assignment of benefit forms.

(ii)    The Podiatry Providers specifically directed Allstate not to send payments to any of the locations where they purported to render services.

(iii)    To the extent the medical records of the Podiatry Providers contain any letterhead, they did not have a contact number or any location where the services were purportedly rendered.

(iv)    None of the Podiatry Providers displayed any signage, or other such information at the No-Fault Clinics indicating their presence at the location.

(v)    The Podiatry Providers did not advertise or market their existence at any of the above locations. Further, even though Levine and Kriegel each have a significant online presence that advertises podiatry services, the addresses located on those websites were different from those listed on billing related to the Fraudulent Scheme. Further, neither website references PENS.

102.    The existence of the unlawful referral and kickback arrangement between the No-Fault Clinics and the Podiatry Providers is further evidenced by the sheer number of distinct healthcare entities that purported to treat the same Insured, at the same location.

103.    As illustrative examples:

(i)    The Kriegel Practice and thirty-three (33) other entities billed Allstate for treatment purportedly rendered to Insured AZ (Claim No. 0689186252) in connection with their alleged May 29, 2023, MVA at the No-Fault Clinic located at 2422 Knapp Street, Brooklyn, NY 11235.

(ii)    The Kriegel Practice and twenty-four (24) other entities billed Allstate for treatment purportedly rendered to Insured CC (Claim No. 0724992243) in connection with their alleged July 12, 2023, MVA at the No-Fault Clinic located at 2354 Westchester Ave., Bronx, NY 10462. Levine also purported to treat Insured CC.

(iii) The Levine Practice and twenty-three (23) other entities billed Allstate for treatment purportedly rendered to Insured IZ (Claim No. 0742049794) in connection with their alleged January 14, 2024, MVA at the No-Fault Clinic located at 79-45 Metropolitan Ave., Middle Village, NY 11379.

(iv) The Levine Practice and fifteen (15) other entities billed Allstate for treatment purportedly rendered to Insured LG (Claim No. 0737894477) in connection with their alleged December 3, 2023, MVA at the No-Fault Clinic located at 49 N. Franklin Street, Hempstead, NY 11550.

(v) The Kriegel Practice and thirteen (13) other entities billed Allstate for treatment purportedly rendered to Insured LG (Claim No. 0677154536) in connection with their alleged July 13, 2022, MVA at the No-Fault Clinic located at 115 Meacham Ave., Elmont, NY 11003.

(vi) The Kriegel Practice and thirteen (13) other entities billed Allstate for treatment purportedly rendered to Insured JJ (Claim No. 0735316309) in connection with their alleged October 31, 2023, MVA at the No-Fault Clinic located at 66-42 Myrtle Ave., Glendale, NY 11385.

(vii) The Kriegel Practice and twelve (12) other entities billed Allstate for treatment purportedly rendered to Insured LC (Claim No. 0747945953) in connection with their alleged March 11, 2024, MVA at the No-Fault Clinic located at 102-28 Jamaica Ave., Jamaica, NY 11418.

(viii) The Kriegel Practice and twelve (12) other entities billed Allstate for treatment purportedly rendered to Insured RL (Claim No. 0711047266) in connection with their alleged April 19, 2023, MVA at the No-Fault Clinic located at 400 Rockaway Ave., Brooklyn, NY 11212.

(ix) The Levine Practice and six (6) other entities billed Allstate for treatment purportedly rendered to Insured JP (Claim No. 0722571742) in connection with their alleged July 23, 2023, MVA at the No-Fault Clinic located 30 S Ocean Ave., Ste 102, Freeport, NY 11520.

(x) The Levine Practice and five (5) other entities billed Allstate for treatment purportedly rendered to Insured MP (Claim No. 0733859243) in connection with their alleged October 21, 2023, MVA at the No-Fault Clinic located 245 Rockaway Ave., Valley Stream, NY 11580.

104. These are only representative examples. In many of the claims identified in *Exhibit 1*, Allstate received billing from numerous medical entities purportedly operating within the same office as the Podiatry Providers, for treatment rendered to the same Insured and as a result of the same accident.

105. In keeping with the fact that the Podiatry Providers obtained patients as part of an illegal referral and kickback arrangement, many of the sixteen locations where the Podiatry Providers allegedly provided the Fraudulent Services have been implicated in criminal or civil matters for their involvement in kickback schemes. Representative samples include:

(i) The No-Fault Clinics located at 2354 Westchester Avenue, 2422 Knapp Street, 486 McDonald Avenue and 79-45 Metropolitan Avenue were implicated in healthcare fraud actions brought by Liberty Mutual Insurance Company ("Liberty Mutual"), GEICO, and Allstate against a Chiropractor who purported to perform medically unnecessary testing on a transient basis gaining access to patients through kickback relationships with the lay owners of the No-Fault Clinics.[5]

(ii) The No-Fault Clinics located at 2422 Knapp Street, 1026 Little E Neck Road, 2354 Westchester Avenue, 30 S Ocean Ave, and 79-45 Metropolitan Avenue were implicated in healthcare fraud actions brought by Allstate and GEICO against fraudulently incorporated healthcare entities associated with a physician who was alleged to have entered into illegal referral arrangements with unlicensed laypersons who controlled the No-Fault Clinics in order to bill for fraudulent services that included Shockwave.[6]

(iii) The No-Fault Clinics located at 102-28 Jamaica Avenue, 2422 Knapp Street, 245 Rockaway Avenue, and 2673 Atlantic Avenue were implicated in healthcare fraud actions brought by Allstate and GEICO against fraudulently incorporated healthcare entities associated with a physician who was alleged to have entered into illegal referral arrangements with unlicensed laypersons who controlled the No-Fault Clinics in order to bill fraudulent services that included Shockwave.[7]

(iv) A psychologist who performed healthcare services at the No-Fault Clinics located at 115 Meacham Ave testified under oath that as part of a similarly designed healthcare fraud scheme against Allstate and other insurers he was assigned to work at these No-Fault Clinics pursuant to unlawful financial agreements. When the scheme was uncovered by an insurer, the orchestrator of the healthcare fraud scheme attempted to change the kickback agreements to appear as "lease agreements" to conceal the kickbacks.

---

[5] Liberty Mutual v. Diane Vavikova, et al., 23-cv-05867 (E.D.N.Y); Gov't Employees Ins. Co. et al., v. Diana Vavikova, D.C. et al., 23-cv-09031 (E.D.N.Y.); Allstate Ins. Co., et al. v. Diana Vavikova D.C., et al., 25-cv-00515 (E.D.N.Y.)

[6] Allstate Ins. Co. et al. v. John Strobeck, MD. et al., 24-cv-01698 (E.D.N.Y.) ; Gov't Emplees Co., et al. v. John Strobeck, M.D. et al., 22-cv-07477 (E.D.N.Y.).

[7] Allstate Ins. Co. et al. v. Community Medical Care of N.Y., P.C., et al., 25-cv-00796 (E.D.N.Y.); Gov't Emples. Co. et al. v. Ahmad Riaz, et al., 22-cv-06713 (E.D.N.Y.).

(v)    The No-Fault Clinics located at 2673 Atlantic Ave and 79-45 Metropolitan Ave were implicated in healthcare fraud actions brought by Allstate.[8] Specifically, Allstate alleged that providers operating at the Clinics prescribed medically unnecessary MRIs in exchange for kickbacks.

106.    Further, despite repeated requests through claims' verification, each of the Podiatry Providers failed to produce to Allstate documentation (space leases, license agreements, purchase agreements, mortgages, utility bill, etc.) that would indicate it was a party in a legitimate arm's length transaction for the office space at any of the purported office locations.

107.    Defendants knew that their patient base was received as part of illegal kickback and referral arrangements.

108.    Unlawful referral relationships between the Defendants and the No-Fault Clinics played an integral and necessary role in carrying out the Fraudulent Scheme against Allstate. Without these agreements, the Defendants would have no means to demand payment from Allstate because they did not have any legitimate patients whose insurance benefits could be used for purposes of seeking payment for the Fraudulent Services.

### E.  Fraudulent Charges for Initial Consultations

109.    Upon receiving access to Insureds from the No-Fault Clinics pursuant to the pay for play arrangement, the Defendants purported to provide virtually every Insured with an initial consultation.

110.    The initial consultations served as the foundation and gateway for the Shockwave and PENS billing, as well as the bogus prescriptions for custom orthotics. Kriegel and/or Levine purported to personally conduct virtually every patient consultation. Then, pursuant to fraudulent pre-determined protocols, diagnosed those patients with bogus podiatric injuries that allegedly

---

[8] Allstate v. Lyons, et al., 1:23-cv-08045- (E.D.N.Y.).

established the medical necessity for Shockwave, PENS, and/or prescriptions for custom orthotic devices.

111.    In fact, the pre-determined protocols for Shockwave, PENS, and orthotic referrals were pre-written into virtually every "consultation" report submitted by the Podiatry Providers. Of the approximately eighty-seven (87) Insureds who were ostensibly referred to Kriegel or Levine for a consultation, Allstate received billing for Shockwave, PENS, and/or orthotics in connection with eighty-five (85) of those Insureds.[9]

112.    The purported consultations also created an additional billing event wherein the Defendants demanded payment from Allstate for consultations that were fraudulently rendered, to the extent they were rendered at all.

113.    The Defendants routinely billed Allstate for the initial consultations under CPT code 99243 or 99244 and charged Allstate between $248.34 and $324.70 for each consultation.

114.    The charges for the initial consultations were fraudulent in that they misrepresented the Podiatry Providers eligibility to collect No-Fault Benefits in the first instance and because they were medically unnecessary and were performed – to the extent they were performed at all, pursuant to illegal referrals.

115.    Moreover, the consultations charged to Allstate by the Defendants were fraudulent in that, among other things, the consultation reports: (i) misrepresented that the consultation was being performed pursuant to a legitimate referral; (ii) falsified the Insureds presenting problems; and (iii) misrepresented the extent and nature of the examinations.

---

[9] Defendants billing for consultations in connection with the remaining two Insureds was unsupported by any treatment note.

**i.    Misrepresentations that the Consultations Were Performed Pursuant to a Referral**

116.    In each and every bill submitted to Allstate by the Defendants for a consultation billed under CPT codes 99243 and 99244, the Defendants misrepresented that the services were being rendered pursuant to a request from a healthcare professional.

117.    According to the Fee Schedule and the CPT Assistant, the use of CPT codes 99243 and 99244 is appropriate only when the consultation is being rendered pursuant to the request of another physician or other appropriate source. The consultation must document the following information: the necessity of the consultation; the name of the requesting physician or other referral on the bill of the consultation; the opinion rendered; and the services ordered or performed as a result of the consultation to the referring entity.

118.    The initial consultations purportedly provided by the Defendants plainly did not satisfy these requirements, nor did virtually any other healthcare provider document any referral for a podiatric consultation

119.    Despite including "referral" forms in many of their claim submissions, the Defendants virtually never disclosed the name of any referring practitioner. Instead, the Defendants intentionally concealed from Allstate that the services were the product of an unlawful referral agreements with the owner/ operators of the Clinics.

120.    Further, medical practitioners within the same No-Fault Clinic where Levine and Kriegel purported to render their consultations, virtually always failed to reference podiatry treatment or a podiatric injury.

121.    For example:

(i)    Levine purported to conduct a podiatric consultation of Insured ML (Claim No. 0712759372) on August 10, 2023, and September 7, 2023, where ML was documented as suffering from, among other things, chronic foot pain and

plantar fasciitis as a result of an MVA occurring on May 5, 2023. The records associated with the consultation do not contain the name of any referring provider and a physician who evaluated ML on July 26, 2023, and August 23, 2023, within the same office as Levine, made no reference to a podiatry referral or the podiatric injuries. Likewise, no other treating provider of ML, in connection with the same MVA, ever requested or acknowledged podiatric treatment.

(ii) Kriegel purported to conduct a podiatric consultation on Insured GR, (Claim No. 0695409417), on April 17, 2023, and May 22, 2023, where GR was documented as suffering from, among other things, difficulty walking and standing and plantar fasciitis as a result of an MVA occurring on December 12, 2022. The records associated with the consultation do not contain the name of any referring provider and a physician who evaluated GR on April 17, 2023, and May 22, 2023, within the same office as Kriegel, made no reference to a podiatry referral or podiatric injuries. Likewise, no other treating provider of GR, in connection with the same MVA, ever requested or acknowledged podiatric treatment.

(iii) Kriegel purported to conduct a podiatric consultation on Insured SV, (Claim No. 0711047266), on May 9, 2023, where SV was documented as suffering from, among other things, plantar fasciitis as a result of an MVA occurring on April 19, 2023. The records associated with the consultation do not contain the name of any referring provider and a physician who evaluated SV on May 9, 2023, within the same office as Kriegel, made no reference to a podiatry referral or podiatric injury. Likewise, no other treating provider of SV, in connection with the same MVA, ever requested or acknowledged podiatric treatment.

(iv) Levine purported to conduct a podiatric consultation on Insured CP, (Claim No. 0724092457), on October 17, 2023, where CP was documented as suffering from, among other things, pain in both feet and both heels as well as plantar fasciitis as a result of an MVA occurring on August 1, 2023. The records associated with the consultation do not contain the name of any referring provider and a physician who evaluated CP on October 17, 2023, within the same office as Levine, made no reference to a podiatry referral or podiatric injury. Likewise, no other treating provider of SV, in connection with the same MVA, ever requested or acknowledged podiatric treatment.

(v) Levine purported to conduct a podiatric consultation on Insured WD, (Claim No. 0729786045), on January 30, 2024, where WD was documented as suffering from, among other things, pain in both heels and both feet as well as plantar fasciitis as a result of an MVA occurring on September 18, 2023. The records associated with the consultation do not contain the name of any referring provider and a physician who evaluated WD on January 30, 2024, within the same office as Levine, made no reference to a podiatry referral or

podiatric injury. Likewise, no other treating provider of WD, in connection with the same MVA, ever requested or acknowledged podiatric treatment.

(vi)     Levine purported to conduct a podiatric consultation on Insured LG, (Claim No. 0737894477), on January 30, 2024, where LG was documented as suffering from, among other things, left leg pain and right foot pain as a result of an MVA occurring on December 3, 2023. The records associated with the consultation do not contain the name of any referring provider and a physician who evaluated LG on January 30, 2024, within the same office as Levine, made no reference to a podiatry referral or podiatric injury. Likewise, no other treating provider of LG, in connection with the same MVA, ever requested or acknowledged podiatric treatment.

(vii)    Levine purported to conduct a podiatric consultation on Insured IZ, (Claim No. 0742049794), on February 1, 2024, where IZ was documented as suffering from, among other things, pain in both feet and plantar fasciitis as a result of an MVA occurring on January 14, 2024. The records associated with the consultation do not contain the name of any referring provider and a physician who evaluated IZ on February 1, 2024, within the same office as Levine, made no reference to a podiatry referral or podiatric injury. Likewise, no other treating provider of IZ, in connection with the same MVA, ever requested or acknowledged podiatric treatment.

(viii)   Levine purported to conduct a podiatric consultation on Insured MP, (Claim No. 0733859243), on January 17, 2024, where MP was documented as suffering from, among to other things, pain in both feet and both legs as a result of an MVA occurring on October 21, 2023. The records associated with the consultation do not contain the name of any referring provider and a physician who evaluated MP on January 17, 2024, within the same office as Levine, made no reference to a podiatry referral or podiatric injury. Likewise, no other treating provider of MP, in connection with the same MVA, ever requested or acknowledged podiatric treatment.

(ix)     Kriegel purported to conduct a podiatric consultation on Insured EB, (Claim No. 0746688340), on March 28, 2024, where EB was documented as suffering from, among other things, pain in both feet and both ankles as a result of an MVA occurring on February 26, 2024. The records associated with the consultation do not contain the name of any referring provider and a physician who evaluated EB on March 28, 2024, within the same office as Kriegel, made no reference to a podiatry referral or podiatric injury. Likewise, no other treating provider of MP, in connection with the same MVA, ever requested or acknowledged podiatric treatment.

(x)      Kriegel purported to conduct a podiatric consultation on Insured TC, (Claim No. 0758330856), on July 16, 2024, where TC was documented as suffering from, among other things, left ankle and left foot pain; and July 30, 2024, where TC was documented as suffering from, among other things, left leg and

left foot pain as a result of an MVA occurring on May 18, 2024. The records associated with the consultation do not contain the name of any referring provider and a physician who evaluated TC on July 16, 2024, or May 18, 2024, within the same office as Kriegel, made no reference to a podiatry referral or podiatric injury. Likewise, no other treating provider of TC, in connection with the same MVA, ever requested or acknowledged podiatric treatment.

122.    These are only representative examples. In virtually all of the claims identified in *Exhibit 1*, the Podiatry Providers failed to document a referring provider, and no other treating provider acknowledged any referral.

**ii.    Misrepresentations Regarding Insureds' Presenting Problems.**

123.    According to the Fee Schedule and CPT Assistant, the use of CPT code 99243 typically requires that the patient present with problems of low to moderate severity. The use of CPT code 99244 requires that the patient present with problems of moderate severity.

124.    Though the Defendants billed many of the purported initial consultations using CPT codes 99243 and 99244, the Insureds virtually never presented to the Podiatry Providers with any podiatric problems, let alone problems involving moderate severity.

125.    To justify billing for the higher reimbursed consultations, the Defendants assigned a pre-determined fake diagnosis to virtually every Insured.

126.    For example, in virtually every "consultation" the Podiatry Providers reported that the Insureds podiatric injury related to the MVA caused the Insured to have "difficulty walking". This presenting problem was illusory and not supported by Insureds' own reported injuries or by the information contained in the records of contemporaneous providers.

127.    Likewise, virtually every consultation report alleged the Insured presented with chronic foot and/or ankle pain which somehow manifested only on the date the Podiatry Providers billed for the Fraudulent Services.

33

128.    Even though the Insureds (along with their "treating" providers) were not shy about reporting a wide range of injuries allegedly resulting from their underlying MVA, virtually no Insured ever reported foot or ankle injuries to any of their other treating providers. For example:

(i)    Insured ET, (claim no. 0719125007) was purportedly involved in an MVA on June 25, 2023, and reported to Allstate in their application for no-fault benefits ("NF-2") on June 29, 2023, to have injured her neck, back, left shoulder and right shoulder in the accident. Nevertheless, on August 17, 2023, Levine documented in his consultation report that ET presented with pain in both ankles and pain in both feet as a result of the MVA. On September 14, 2023, Kriegel purported to perform a consultation of ET noting pain in the right heel and right foot, and no injury to the left foot or heel.

(ii)    Insured CS, (claim No. 0696382621) was purportedly involved in an MVA on December 17, 2022, and reported to Allstate on his NF-2 on December 20, 2022, to have injured his wrist, arm, shoulder, neck and back. Nevertheless, on September 22, 2023, Levine documented on his consultation report that CS presented with pain in the balls of both feet and pain in the right foot as a result of the MVA.

(iii)    Insured JB, (claim No. 0715149076) was purportedly involved in an MVA on March 24, 2023, and reported to Allstate on his NF-2 on May 30, 2023, to have injured his neck, thoracic and lumbar spine, left shoulder, right wrist, and right hand. Nevertheless, on June 14, 2023, Kriegel documented on his consultation report that JB presented with pain in his left foot as a result of the MVA.

(iv)    Insured JGU, (claim No. 0708897474) was purportedly involved in an MVA on March 15, 2023, and reported to Allstate on his NF-2 on March 17, 2023, to have injured his cervical, thoracic & lumbar spine, shoulder, knee and headache. Nevertheless, on March 30, 2023, Kriegel documented on his consultation report that JGU presented with pain in both feet and both ankles as a result of the MVA.

(v)    Insured LF, (claim No. 0716437413) was purportedly involved in an MVA on March 15, 2023, and reported to Allstate on his NF-2 on June 6, 2023, to have injured his head. Nevertheless, on June 20, 2023, Kriegel documented on his consultation report that LF presented with pain in his left foot as a result of the MVA. On July 24, 2023, Kriegel documented on his consultation report that LF presented with pain in both feet and both ankles and a result of the MVA.

(vi)    Insured JP, (claim No. 0722571742) was purportedly involved in an MVA on July 23, 2023, and reported to Allstate on his NF-2 on August 7, 2023, to have injured his back, left shoulder, left elbow, and right wrist. Nevertheless, on

September 8, 2023, Kriegel documented on his consultation report that JP presented with pain in the balls of both feet and both heels as a result of the MVA.

(vii)  Insured FJ, (claim No. 0735316309) was purportedly involved in an MVA on October 31, 2023, and reported to Allstate on his NF-2 on November 7, 2023, to have injured his neck, left shoulder, mid and low back. Nevertheless, on November 14, 2023, Kriegel documented on his consultation report that FJ presented with pain in both legs as a result of the MVA.

(viii) Insured CP, (claim No. 0724092457) was purportedly involved in an MVA on August 1, 2023, and reported to Allstate on his NF-2 on August 3, 2023, to have sustained "multiple" injuries. Emergency department records from August 1, 2023, indicate a complaint of chest pain and normal musculoskeletal exams. Nevertheless, on October 17, 2023, Levine documented on his consultation report that CP presented with pain in both heels and both feet as a result of the MVA.

(ix)  Insured EB, (claim No. 0746688340) was purportedly involved in an MVA on February 26, 2024, and reported to Allstate on her NF-2 on March 6, 2024, to have injured her head, neck, low back and left hip. Nevertheless, on March 28, 2024, Kriegel documented on his consultation report that EB presented with pain in both feet and both ankles as a result of the MVA.

(x)  Insured LCL, (claim No. 0747945953) was purportedly involved in an MVA on March 11, 2024, and reported neck and back injuries to Allstate on his NF-2 on March 12, 2024, Nevertheless, on May 30, 2024, Levine documented on his consultation report that LCL presented with left foot and ankle pain as a result of the MVA.

129.  These are only representative examples. In virtually all of the claims identified in *Exhibit 1*, the Insureds' alleged podiatric injuries were never documented by the Insured or any provider other than the Podiatry Providers.

### iii.  Misrepresentations Regarding the Nature and Extent of Examinations.

130.  In addition to misrepresenting the referral source and the patient's presenting problems, the Defendants misrepresented the nature and extent of the consultation.

131.  The use of CPT code 99243 typically requires that a physician spend thirty (30) minutes of face-to-face time with the patient or patients' family during the examination. The use of CPT code 99244 typically requires forty (40) minutes of face-to-face time.

132.    Upon information and belief, to the extent that Kriegel or Levine conducted a consultation at all, it lasted a fraction of the that time.

133.    In addition, pursuant to the Fee Schedule and CPT Assistant, when the Defendants submitted, or caused to be submitted, charges for an initial consultation under CPT code 99243, they represented that Kriegel or Levine (a) took a "comprehensive" patient history; (b) conducted a "comprehensive physical examination"; and (c) engaged in medical decision making of "low complexity". CPT code 99244 has the same requirements but encompasses medical decision making of "moderate complexity." In reality, the billed for consultations of the Defendants failed to satisfy any of these requirements.

### a.  Misrepresentation of Patient Histories

134.    Pursuant to the Fee Schedule, a comprehensive patient history requires that the physician take: an extended history of the present illness; a history of all body systems, not only the body systems that are related to the patient's present complaint; and a complete past, family, surgical and social history from the patient.

135.    In the context of Podiatry, the initial consultation allows the podiatrist to learn more about the patient, involves an assessment of their current and previous personal and family health history and any past problems, surgeries, or treatments the patient may have had, particularly as it relates to the feet or ankles. The podiatrist inquiries about any medications the patient is taking, allergies and symptoms, lifestyle, and anything else that could be relevant to the patient's condition.

136.    As a result of the patient histories ostensibly taken by the Podiatry Providers during the consultation, the Podiatry Providers routinely diagnosed Insureds they treated as suffering with plantar fasciitis caused by the MVA.

137.    Plantar fasciitis typically develops from overuse and repeated stress on the heal. Activities such as running or prolonged standing can place strain on the plantar fascia. Plantar fasciitis rarely occurs as the result of a traumatic event, and virtually never as the result of a motor vehicle accident.

138.    Notwithstanding the facial implausibility, if not impossibility, of the number of plantar fasciitis diagnoses rendered by the Podiatry Providers as a result of an MVA, the Podiatry Providers' consultations and patient histories were utterly devoid of any meaningful patient history that could be used to formulate the diagnosis.

139.    In a legitimate podiatry setting, if presented with a patient suffering from foot pain caused by a traumatic event, such as a car accident, the standard of care would be to first rule out more plausible causes of immediate foot pain, such as a fracture, dislocation, or tear of the plantar fascia. The standard of care to assess these injuries is, among other things, to order and review X-rays of the patient's feet and/or ankles and conduct a vascular exam. The Podiatry Providers virtually never reviewed or ordered any X-rays as part of their consultations and failed to conduct a vascular exam.

140.    A legitimate Podiatrist would not diagnose a patient with plantar fasciitis from a traumatic event without first reviewing X-rays and conducting a vascular exam.

141.    Moreover, the alleged findings on the Podiatry Providers consultations were often not consistent with a diagnosis of plantar fasciitis but rather other injuries that were never acknowledged or treated by the Podiatry Providers. For example, the Podiatry Providers routinely recorded Insured's feet with restricted range of motion. This condition is associated with fracture or tendonitis and is not a symptom of plantar fasciitis.

142.    Further, to the extent the consultations included any patient history, they often failed to accurately reflect the Insureds actual medical history.

143.    For example, each consultation report purported to contain the Insureds "medications" which often failed to include medications that the Insured was prescribed due to injuries arising from the very same accident that allegedly caused the podiatric injury.

144.    Below are representative examples:

(i)    On June 14, 2023, Kriegel noted in Insured JB's, (Claim No. 0715149076) "medication history" that JB denied use of any medications. Pharmacy records submitted to Allstate documented that Diclofenac Sodium gel, Naproxen Sodium and Cyclobenzaprine had been delivered to JB on June 8, 2023, less than a week prior to the consultation.

(ii)    On June 7, 2023, June 28, 2023, and July 26, 2023, Kriegel noted in Insured SR's, (Claim No. 0715149076) "medication history" that SR denied use of any medications. Pharmacy records submitted to Allstate documented that Somnicin had been delivered to SR on June 8, 2023.

(iii)    On August 17, 2023, Levine noted in insured ET's, (Claim No. 0719125007) "medication history" that ET denied the use of any medications. Pharmacy records submitted to Allstate documented that Lidocaine and Tizanidine had been delivered to ET on July 29, 2023.

(iv)    On May 30, 2023, and June 20, 2023, Kriegel noted in Insured LC's, (Claim No. 0747945953) "medication history" that LC claimed to only use Ibuprofen medication. Pharmacy records submitted to Allstate documented that Naproxen and Pennsaid had been delivered to LC on April 26, 2023, and Vimovo and Pennsaid on June 19, 2023.

(v)    On June 14, 2023, June 21, 2023, July 12, 2023, and September 20, 2023, Kriegel noted in Insured MZ's, (Claim No. 0716411277) "medication history" that MZ denied using any medications. Pharmacy records submitted to Allstate documented that Naproxen, Cyclobenzaprine and Diclofenac had been delivered to MZ on June 14, 2023, Somnicin on June 14, 2023, and Percocet, Cipro and Lidocaine on July 25, 2023.

(vi)    On October 30, 2023, Kriegel noted in Insured AM's, (Claim No. 0716437413) "medication history" that AM denied using any medications. Pharmacy records submitted to Allstate documented that AM had been delivered Lidocaine and Cyclobenzaprine on July 9, 2023, and Lidocaine, Cyclobenzaprine and Diclofenac on August 1, 2023.

(vii)   On August 27, 2024, Kriegel noted in Insured EB's, (Claim No. 0746688340) "medication history" that EB denied using any medications. Pharmacy records submitted to Allstate documented that Acetaminophen, Lidocaine and Cyclobenzaprine had been delivered to EB on March 15, 2024.

(viii)  On September 14, 2023, Kriegel noted in Insured ET's, (Claim No. 0719125007) "medication history" that ET denied using any medications. Medical reports submitted to Allstate documented that Lidocaine and Tizanidine had been delivered to ET on July 29, 2023.

(ix)    On March 18, 2024, Kriegel noted in Insured JJ's, (Claim No. 0735316309) "medication history" that JJ denied using any medications. Pharmacy records submitted to Allstate documented that Ibuprofen, Diclofenac, Lidocaine, and Tizanidine had been delivered to JJ on December 12, 2023.

(x)     On April 26, 2023, Kriegel noted in Insured RP's, (Claim No. 0679311720) "medication history" that RP denied using any medications. Pharmacy records submitted to Allstate documented that Lidocaine, Cipro and Percocet had been delivered to RP on February 1, 2023.

145.    These are only representative examples. In many of the claims identified in *Exhibit 1* for consultations, the Podiatry Providers misrepresented the Insureds medication history.

146.    No legitimate podiatrist could derive any treatment plan, including Shockwave or PENs, and without reviewing the patient's medication history, particularly relating to medications prescribed for the same incident that allegedly caused the podiatric injuries.

147.    By failing to conduct a legitimate review of the Insureds' medication history, the Podiatry Providers were unable to determine whether the prescribed medications were efficacious, masking the injuries, or themselves causing the pain. Further, without an accurate and complete medication history, a podiatrist cannot derive a treatment plan going forward without exposing Insureds to a risk of therapeutic duplication, overdoses, or prescribing medications that were ineffective or caused that patient undesirable side effects.

148.    Likewise, the patient histories virtually all stated that the Insured had undergone physical therapy even though virtually no Insured ever received physical therapy related to a podiatric condition.

b.     **Failure to conduct a "comprehensive physical examination"**

149.    Under the Fee Schedule and CPT Assistant, a physical consultation does not qualify as "comprehensive" unless the examining physician either: conducts a general examination of multiple patient organ systems; or conducts a complete examination of a single patient organ system.

150.    The Defendants never performed any legitimate consultation of any Insured, let alone a "comprehensive consultation."

151.    Incontrovertibly demonstrating that the consultations were not "comprehensive," virtually every Insured that purportedly consulted with Levine or Kriegel was found to be in the same exact condition "on current examination" as demonstrated below:

Levine Patient WD (Claim No. 0729786045)

undergo Therapeutic Radial Pressure Wave (PENS) therapy. Based on the consultation, study of the patient's medical history, and available medical data (see attachment), the patient's recovery remains far below the Maximum Medical Improvement (MMI). On current examination, there is a considerable loss in both active and passive range of motion, severe end-range discomfort, many malalignments, myofascial sensitivity, hypertonicity, trigger points, and palpation pain. The patient's VAS and pain

Levine Patient JG (Claim No. 0721390516)

undergo Therapeutic Radial Pressure Wave (PENS) therapy. Based on the consultation, study of the patient's medical history, and available medical data (see attachment), the patient's recovery remains far below the Maximum Medical Improvement (MMI). On current examination, there is a considerable loss in both active and passive range of motion, severe end-range discomfort, many malalignments, myofascial sensitivity, hypertonicity, trigger points, and palpation pain. The patient's VAS and pain

Levine LG (Claim No. 0741615033)

undergo Therapeutic Radial Pressure Wave (PENS) therapy. Based on the consultation, study of the patient's medical history, and available medical data (see attachment), the patient's recovery remains far below the Maximum Medical Improvement (MMI). On current examination, there is a considerable loss in both active and passive range of motion, severe end-range discomfort, many malalignments, myofascial sensitivity, hypertonicity, trigger points, and palpation pain. The patient's VAS and pain

Kriegel Patient VS (Claim No. 0711047266)

accident-related injuries. The patient's recovery remains significantly below the Maximum Medical Improvement (MMI) based on the consultation, analysis of the patient's medical history, and accessible medical data (see attachment). On current examination, there is a significant reduction in both active and passive range of motion, severe end-range distress, numerous malalignments, myofascial sensitivity, hypertonicity, trigger points, and palpation pain. The patient's VAS and pain diagram illustrate the reason for

Kriegel Patient JJ (Claim No. 0735316309)

accident-related injuries. The patient's recovery remains significantly below the Maximum Medical Improvement (MMI) based on the consultation, analysis of the patient's medical history, and accessible medical data (see attachment). On current examination, there is a significant reduction in both active and passive range of motion, severe end-range distress, numerous malalignments, myofascial sensitivity, hypertonicity, trigger points, and palpation pain. The patient's VAS and pain diagram illustrate the reason for

Kriegel Patient EB (Claim No. 0746688340)

The patient was advised to undergo Therapeutic Radial Pressure Wave (PENS) therapy after complaining of persistent pain from accident-related injuries. The patient's recovery remains significantly below the Maximum Medical Improvement (MMI) based on the consultation, analysis of the patient's medical history, and accessible medical data (see attachment). On current examination, there is a significant reduction in both active and passive range of motion, severe end-range distress, numerous malalignments, myofascial sensitivity, hypertonicity, trigger points, and palpation pain. The patient's VAS and pain diagram illustrate the reason for

152. Likewise, virtually every Insured's "objective findings" on the date of the consultation were identical as demonstrated below:

Levine Patient WD (Claim No. 0729786045)

Active and passive ROM are considerably decreased, palpation findings indicate modest to moderate discomfort, and the patient reports a VAS pain level of 4/10 and considerable problems with ADLS, according to today's objective findings. Based on these results and an assessment of the patient's

Levine Patient Patient JG (Claim No. 0721390516)

Active and passive ROM are considerably decreased, palpation findings indicate modest to moderate discomfort, and the patient reports a VAS pain level of 4/10 and considerable problems with ADLS, according to today's objective findings. Based on these results and an assessment of the patient's

Levine Patient LG (Claim No. 0741615033)

Active and passive ROM are considerably decreased, palpation findings indicate modest to moderate discomfort, and the patient reports a VAS pain level of 4/10 and considerable problems with ADLS, according to today's objective findings. Based on these results and an assessment of the patient's

Kriegel Patient VS (Claim No. 0711047266)

Active and passive ROM are significantly reduced, palpation findings indicate modest to moderate discomfort, and the patient reports a VAS pain level of 4/10 and moderate difficulties with ADLS, according to today's objective findings. Based on these findings

Kriegel Patient JJ (Claim No. 0735316309)

Active and passive ROM are significantly reduced, palpation findings indicate modest to moderate discomfort, and the patient reports a VAS pain level of 4/10 and moderate difficulties with ADLS, according to today's objective findings. Based on these findings

Kriegel Patient EB (Claim No. 0746688340)

Active and passive ROM are significantly reduced, palpation findings indicate modest to moderate discomfort, and the patient reports a VAS pain level of 4/10 and moderate difficulties with ADLS, according to today's objective findings. Based on these findings

153. It would be impossible for every patient, each with their own unique set of individual circumstances, to all have the same exact objective findings and be in the same condition on the dates of their initial consultations with Kriegel and Levine.

154. Further highlighting that no legitimate consultation took place, in virtually every consultation, both Kriegel and Levine, assessed the patient with "chronic foot pain" as a result of the motor vehicle accident.

155.    Foot pain is considered "chronic" when it lasts in duration for more than three months. Nevertheless, in order to support the fraudulent billing, the Defendants routinely diagnosed patients with "chronic" foot pain prematurely, often withing days or weeks of the MVA. For example:

(i)    Kriegel diagnosed Insured FH (Claim No.  0731901898) with chronic foot pain on October 12, 2023, resulting from a MVA which occurred six days earlier on October 6, 2023.

(ii)    Kriegel diagnosed Insured WD (Claim No. 0732266820) with chronic foot pain on October 17, 2023, resulting from a MVA which occurred six days earlier on October 11, 2023.

(iii)    Kriegel diagnosed Insured SR (Claim No. 0715149076) with chronic foot pain on June 7, 2023, resulting from a MVA which occurred fourteen days earlier on March 24, 2023.

(iv)    Kriegel diagnosed Insured FJ (Claim No. 0735316309) with chronic foot pain on November 14, 2023, resulting from a MVA which occurred fourteen days earlier on October 31, 2023.

(v)    Kriegel diagnosed Insured JGU (Claim No. 0708897474) with chronic foot pain on March 30, 2023, resulting from a MVA which occurred fifteen days earlier on March 15, 2023.

(vi)    Kriegel diagnosed Insured KC (Claim No. 0708897474) with chronic foot pain on March 30, 2023, resulting from a MVA which occurred fifteen days earlier on March 15, 2023.

(vii)    Kriegel diagnosed Insured JG (Claim No. 0716437413) with chronic foot pain on June 20, 2023, resulting from a MVA which occurred fifteen days earlier on June 3, 2023.

(viii)    Levine diagnosed Insured AN (Claim No.  0738609536) with chronic foot pain on January 4, 2024, resulting from a MVA which occurred thirty-five days earlier on December 1, 2023.

(ix)    Levine diagnosed Insured AC (Claim No. 0722571742) with chronic foot pain on September 8, 2023, resulting from a MVA which occurred forty-eight days earlier on July 23, 2023.

156.    These are only representative examples. In many of the claims identified in *Exhibit 1*, the Podiatry Providers prematurely diagnosed the Insured with chronic foot pain.

### c. Misrepresentations Regarding Medical Decision Making

157.    Pursuant to the Fee Schedule and CPT Assistant, the complexity of medical decision-making is measured by: the number of diagnoses and/or the number of management options to be considered; the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved reviewed, and analyzed; and the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

158.    Although the Defendants routinely represented that their initial consultations involved medical decision-making of low to moderate complexity, in reality they included no medical decision making at all.

159.    Initially, the Defendants never requested or reviewed patient medical records as part of their initial consultations or conducted any diagnostic tests.

160.    Additionally, the Defendants did not genuinely consider any significant number of diagnoses or treatment options for Insureds during the initial consultations. Rather, to the extent that the consultations were conducted in the first instance, the Defendants made a boilerplate, predetermined "diagnosis" for every Insured, upon which the Defendants directed the Insureds to receive a predetermined "Recommended Treatment Plan" which virtually always included Shockwave, PENs, and/or orthotics.

### F. Defendants Fraudulent Billing for Shockwave and PENs

161.    Regardless of the medical needs of the Insureds, on the same date of the putative "initial consultation" of the Insured, the Defendants routinely purported to provide Shockwave and/or PENS.

162. The Defendants billed Shockwave and PENS pursuant to the illegal referral and kickback agreements and predetermined treatment protocols which were designed solely for the Defendants' pecuniary gain, with a complete disregard of patient welfare or medical necessity.

163. To the extent that Shockwave and/or PENS were rendered to Insureds at all, they were rendered in a grossly unethical manner and solely for purposes of defrauding Allstate and other insurers.

164. In fact, Levine and Kriegel's purported treatment records virtually always confused Shockwave and PENS. Legitimate Shockwave and PENs are distinct treatments, use different treatment mechanisms, and are rendered for different purposes. No legitimate healthcare provider, or anyone trained in the use of the treatments, would describe them synonymously or report them interchangeably.

### i. Legitimate Use of Shockwave

165. At all times relevant to this Complaint, the CPT code for Shockwave, 0101T, encompassed both "Extracorporeal Shockwave" and "Radial Pressure Wave Therapy". The treatments are collectively referred to as Shockwave in this Complaint because the Podiatry Providers, inexplicably, purported to administer both simultaneously. As an illustration, Kriegel and Levine "signed" treatment records noting that a particular Insured had "RPW" therapy, and then drafted letters to Allstate stating that they "performed Extracorporeal Shockwave procedure" on that same Insured.

166. Legitimate Extracorporeal Shockwave involves a focused high energy wave that targets deeper tissues with precision. Its efficacy is recognized in the field of urology for the treatment of urinary stones. The treatment involves a powerful "shockwave" which is sufficient in

strength to mechanically break up urinary stones into smaller stones that can be passed down the urinary tract and out of the body. The procedure is often performed under anesthesia.

167.    Extracorporeal Shockwave is less common, but also used in the field of podiatry as a treatment for plantar fasciitis in patients who have had chronic recalcitrant plantar fasciitis lasting at least six months and after conventional treatment such as rest, ice, medications, and physical therapy have failed to alleviate the condition. To the extent some podiatrists perform it at all, it is typically as a last resort before surgery.

168.    Legitimate Radial Pressure Wave therapy uses a lower energy wave that spreads radially to treat broader, more superficial areas. Radial Pressure Wave is not well documented for use in musculoskeletal injuries such plantar fasciitis, and its use is considered experimental, unproven, and investigational. It is not recognized as a treatment for podiatric injuries by any leading authorities of podiatric medicine including the Journal of Bone and Joint Surgery, Foot and Ankle Surgery, or Foot & Ankle International.

169.    There is no authority or support for the use of Extracorporeal Shockwave or Radial Pressure Wave in the manner used by the Defendants, i.e. as a substitute for benchmark treatments for podiatry conditions such as plantar fasciitis, which include stretching, strengthening exercises, ultrasound and taping.

### ii.    Legitimate Use of PENS

170.    According to Blue Cross Blue Shield, Percutaneous Electrical Nerve Stimulation PENS and percutaneous neuromodulation therapy (PNT) are therapies that combine the features of electroacupuncture and transcutaneous electrical nerve stimulation (TENS). PENS is performed with needle electrodes while PNT uses very fine needle-like electrode arrays that are placed in close proximity to the pain area to stimulate peripheral sensory nerves in the soft tissue.

171.    PENS is similar in concept to TENS but differs in that needles are inserted either around or immediately adjacent to the nerves serving the painful area and are then stimulated. PENS is generally reserved for paints who fail to get pain relief from TENS.

172.    PENS is considered an experimental treatment, and well-blinded studies are lacking. To the extent it has been studied, patients were required to have a localized area of hyperalgesia on the body surface, and to not have obtained pain relief with previous medical treatment.

173.    The Podiatry Providers alleged to have performed a variant of PENS known as "BioWave". According to the manufacturer of the BioWave device:

> "BioWave's patented, high frequency neurostimulation is delivered through the skin directly to pain nerves, inhibiting action potential propagation along the nerve and blocking transmission of pain signals to the brain."

174.    The manufacturer described the device to the Food and Drug Administration stating:

510(k) Summary
for the Biowave Deepwave Percutaneous
Neuromodulation Pain Therapy System

1.     DEVICE NAME
       Proprietary Name:          Deepwave Percutaneous Neuromodulation Pain
                                  Therapy System
       Common/Usual Name:         Electrical Muscle and Nerve Stimulator
       Classification Names:      Percutaneous Electrical Nerve Stimulation Devices

2.     INTENDED USE
       The Deepwave Percutaneous Neuromodulation Pain Therapy System is comprised of
       a percutaneous electrode array and the Deepwave Neuromodulation Pain Therapy
       Device.  The Deepwave Percutaneous Neuromodulation Pain Therapy System is
       indicated for:
       • Symptomatic relief of chronic, intractable pain, post surgical and post-
         traumatic acute pain;
       • Symptomatic relief of post-traumatic pain;
       • Symptomatic relief of post-operative pain.

3.     DEVICE DESCRIPTION
       Biowave Corporation's Deepwave Percutaneous Neuromodulation Pain Therapy
       System is essentially identical to Biowave's Deepwave Neuromodulation Pain
       Therapy Device cleared under K052289 except that the proposed device includes a
       percutaneous electrode array instead of standard surface electrodes.

       The percutaneous electrode array (PEA) is a sterile, single-use microneedle patch
       which facilitates the delivery of electrical signals through the skin into
       tissue………Neuromodulation device sends a signal from the Feed Pad through the
       body to the PEA.

175.    In their letters of "medical necessity", the Podiatry Providers stated that "BioWave

PENS involves 1014 microneedles in the electrode array of a BiowavePro device are used to

transmit therapeutic signals that inhibit pain signals before they reach the surface."

176.    Thus, according to the manufacturer of the device and the Podiatry Providers,

BioWave PENS is a neurological procedure.

177.    A neurological procedure is ineffective in treating a musculoskeletal injury of the

foot or ankle such as plantar fasciitis.

178.    Lastly, PENS has not been studied for use in combination with Shockwave which

was routinely included in the Podiatry Providers treatment plans.

### iii.    Background of Defendants Shockwave and PENS Billing

179.    The Defendants alleged use of "Shockwave" and "PENS" in furtherance of the Fraudulent Scheme was a direct result of changes in the Workers Compensation Fee Schedule (previously defined as "Fee Schedule") designed to reduce fraud in the No-Fault system. Specifically, between April 1, 2019, and October 1, 2020, material changes to the Fee Schedule limited reimbursement for CPT codes that had been previously targeted for fraud and abuse.

180.    In response to the changes, healthcare fraud perpetrators such as the Defendants herein, adapted their schemes to target new services whose associated CPT codes could be used to perpetrate the Fraudulent Scheme.

181.    Relevant to the instant action, the Workers' Compensation Board assigned a value to CPT code 0101T, alleviating the previous requirement that the practitioner justify the amount charged by providing pertinent information concerning the nature, extent, and need for the procedure or service, and the necessary time, skill and equipment needed to perform the procedure.

182.    The Fee Schedule change to CPT code 0101T created a new avenue for those seeking to perpetrate healthcare fraud schemes, and within months of that change, Shockwave went from being virtually non-existent within No-Fault to the centerpiece of countless healthcare fraud schemes orchestrated within No-Fault.

183.    In response to the tsunami of fraudulent claims submitted for Shockwave, No-Fault insurers adapted their claim defenses and fraud prevention practices to combat the fraudulent billing associated with this treatment. To counteract these measures and maximize their illicit gains, the Defendants changed the label of their treatment from Shockwave to PENS, assigned it a different CPT code, but continued to document the same underlying service. As such, upon information and belief, there was no distinction in the Podiatry Providers billed for services despite PENS and Shockwave being distinct and unrelated treatments.

184.    The Defendants' treatment records, submitted in connection with virtually every Insured, demonstrated that the billed for Shockwave and PENs treatment were distinguished by label and CPT code only.

185.    As an example, the Defendants used the acronym PENS for services described as "Therapeutic Radial Pressure Wave".

Levine Patient JG (Claim No. 0721390516)
After complaining of ongoing discomfort from accident-related injuries, the patient was advised to undergo Therapeutic Radial Pressure Wave (PENS) therapy. Based on the consultation, study of the

Kriegel Patient EB (Claim No. 0746688340)
The patient was advised to undergo Therapeutic Radial Pressure Wave (PENS) therapy after complaining of persistent pain

186.    Likewise, the "Biowave PENS report" that the Defendants submitted to Allstate to induce payment for the PENS billing, described PENS as "a non-invasive physical agent that affects the disease being treated using sound wave impulses that take on a mechanical component when they touch the body." Soundwaves are associated with Shockwave treatment, not PENS.

187.    Further, the Defendants often documented in their letters of medical necessity, that the "no other conservative medical intervention besides PENS" was appropriate for the patient, and then purported to proceed with "Radial Pressure Wave Shockwave therapy."

Levine Patient SG (Claim No. 0697954212)
diagram demonstrate why the PENS operation was performed today. Given that this patient is not a surgical candidate, has not achieved MMI from other aggressive and/or conservative treatment modalities, and has no other conservative medical intervention besides PENS at this time to correct mal-alignments, joint stiffness, subluxation, fibrous adhesions, and/or calcifications, a series of one to three therapeutic Radial Pressure Wave Shockwave therapy sessions is appropriate. Therapeutic

Kriegel Patient GR (Claim No. 0695409417)
the PENS surgery conducted today. Given that this patient is not a surgical candidate, has not achieved MMI from other aggressive
                                                    ***
and/or conservative treatment modalities, and there is no other conservative medical intervention besides PENS at this time to correct mal-alignments, joint stiffness, subluxation, fibrous adhesions, and/or calcifications, a series of one to three therapeutic Radial Pressure Wave Shockwave therapy sessions is appropriate. Therapeutic PENS is a non-invasive physical agent that affects the

188.    Moreover, the treatment records used by the Podiatry Providers to support and document the so-called PENS treatments, were sloppy variations of the same treatment records

that have been submitted to Allstate by ostensibly unrelated providers engaged in the same type of fraudulent healthcare scheme as described herein. Essentially, the Defendants plagiarized someone else's treatment record for Shockwave, applied some synonyms, and then called the treatment PENS.

189.    For example, John Strobeck, who was a defendant in *Allstate et al, v. Strobeck et, al.*[10] documented Shockwave treatment to Allstate as follows:

> Due to complaints of persistent pain following injuries sustained in an accident, the above-said patient was referred for Therapeutic Radial Pressure Wave (RPW) therapy. Based on the consultation, review of the patient's history and available medical records (see attached), patient's recovery is still at considerably less than Maximum Medical Improvement (MMI). On examination today, there remains a significant decrease in tested active and passive range of motion, significant end-range pain, various mal-alignments, myofascial tenderness, hypertonicity, trigger points and pain to palpation. The patient's VAS and pain diagram show the indication for the RPW procedure being done today. Considering that this patient is not a surgical candidate yet, patient has not achieved MMI from other aggressive and/or conservative treatment modalities, there is no other conservative medical intervention, other than RPW at this point in time to correct mal-alignments, joint stiffness, subluxation, fibrous adhesions and/or calcifications, it is appropriate to proceed with a series of one to three therapeutic Radial Pressure Wave Shockwave therapy. Therapeutic RPW is a non-invasive physical agent that influences the condition being treated through impulses of a sound waves that then becomes mechanical in nature when in contact with the body. Most treatment sessions last

190.    The same exact record was used by Omar Ahmad, MD, a Defendant in the action of *Allstate et al. v Omar Ahmad, MD, et al.*[11] to document Shockwave:

> Due to complaints of persistent pain following injuries sustained in an accident, the above-said patient was referred for Therapeutic Radial Pressure Wave (RPW) therapy. Based on the consultation, review of the patient's history and available medical records (see attached), patient's recovery is still at considerably less than Maximum Medical Improvement (MMI). On examination today, there remains a significant decrease in tested active and passive range of motion, significant end-range pain, various mal-alignments, myofascial tenderness, hypertonicity, trigger points and pain to palpation. The patient's VAS and pain diagram show the indication for the RPW procedure being done today. Considering that this patient is not a surgical candidate yet, patient has not achieved MMI from other aggressive and/or conservative treatment modalities, there is no other conservative medical intervention, other than RPW at this point in time to correct mal-alignments, joint stiffness, subluxation, fibrous adhesions and/or calcifications, it is appropriate to proceed with a series of one to three therapeutic Radial Pressure Wave Shockwave therapy. Therapeutic RPW is a non-invasive physical agent that influences the condition being treated through impulses of a sound waves that then becomes mechanical in nature when in contact with the body. Most treatment sessions last

191.    Below are representative examples of the treatment notes that the Podiatry Providers used to document virtually every *PENS* treatment:

---

[10] Allstate v. John Strobeck, M.D. et al., 22-cv-07477 (E.D.N.Y.).
[11] Allstate v. Omar Ahmad, et al., 24-cv- 03126 (E.D.N.Y.).

Sample of Record used by Levine for Insured LG (Claim No. 0737894477)

After complaining of ongoing discomfort from accident-related injuries, the patient was advised to undergo Therapeutic Radial Pressure Wave (PENS) therapy. Based on the consultation, study of the patient's medical history, and available medical data (see attachment), the patient's recovery remains far-below-the-Maximum Medical Improvement (MMI). On current examination, there is a considerable loss in both active and passive range of motion, severe end-range discomfort, many malalignments, myofascial sensitivity, hypertonicity, trigger points, and palpation pain. The patient's VAS and pain diagram demonstrate why the PENS operation was performed today. Given that this patient is not a surgical candidate, has not achieved MMI from other aggressive and/or conservative treatment modalities, and has no other conservative medical intervention besides PENS at this time to correct mal-alignments, joint stiffness, subluxation, fibrous adhesions, and/or calcifications, a series of one to three therapeutic Radial Pressure Wave Shockwave therapy sessions is appropriate. Therapeutic PENS is a non-invasive physical agent that affects the disease being treated using sound wave impulses that take on a mechanical component when they touch the body. Most treatment sessions

Sample of Record used by Kriegel for Insured DS (Claim No. 0707789418)

The patient was advised to undergo Therapeutic Radial Pressure Wave (PENS) therapy after complaining of persistent pain from accident-related injuries. The patient's recovery remains significantly below the Maximum Medical Improvement (MMI) based on the consultation, analysis of the patient's medical history, and accessible medical data (see attachment). On current examination, there is a significant reduction in both active and passive range of motion, severe end-range distress, numerous malalignments, myofascial sensitivity, hypertonicity, trigger points, and palpation pain. The patient's VAS and pain diagram illustrate the reason for the PENS surgery conducted today. Given that this patient is not a surgical candidate, has not achieved MMI from other aggressive

***

and/or conservative treatment modalities, and there is no other conservative medical intervention besides PENS at this time to correct mal-alignments, joint stiffness, subluxation, fibrous adhesions, and/or calcifications, a series of one to three therapeutic Radial Pressure Wave Shockwave therapy sessions is appropriate. Therapeutic PENS is a non-invasive physical agent that affects the malady being treated through sound wave impulses that take on a mechanical nature when they encounter the body. Most ... to three times per week for a total of 12 visits. Although many

192.     It can be plainly observed that the treatment notes used by the Defendants ostensibly to document the podiatric PENS is the same treatment note used by medical doctors to document Shockwave rendered to patients' back and upper extremities. The Defendants simply changed the title on a Shockwave template and passed it off as a treatment record for PENS.

193.     Accordingly, there was no genuine distinction in the Defendants' Shockwave and PENS treatment, which had no relationship to actual medical treatment rendered to Insureds and was solely the product of ever-evolving healthcare fraud schemes that have plagued the New York No-Fault Insurance system.

   **iv.    Defendants' Fraudulent Billing for Shockwave and PENS Services Not Rendered**

194.     Despite submitting a substantial volume of billing for Shockwave and PENS, the Defendants never submitted to Allstate any patient specific records which indicated that either PENS or Shockwave were ever rendered to any Insured. To the extent that the individual records

appeared to document a treatment representing PENS or Shockwave, such documentation was often cookie cutter verbiage that was identical across all Insureds.

195.    For example, the so called "PENS" treatment notes were pre-printed and virtually word for word identical across all patients. The only patient specific information that was provided which related to PENS was by way of a checklist, as shown below:

Levine Patient AC (Claim No. 0722571742)



Kriegel Patient RL (Claim No. 0679311720)



196.    On the surface, the Shockwave treatment notes appear to provide greater detail of the treatment, but this was likewise templated and not evidence that any services were actually rendered.

197.    Legitimate Shockwave involves a pulse being administered to a patient. The strength of that pulse varies from patient to patient based upon things such as their pain tolerance and subjective response to the treatment. The strength of the wave administered even to the same patient often varies as treatment progresses.

198.    Conversely, the Defendants' Shockwave records virtually always purported to indicate that the treatment was rendered at the same exact strength, pressure, pulse and frequency, with virtually no variation based on the individual circumstances of each patient.

199.    Below are representative examples:

Levine Patient WD (Claim No. 0732266820)

**PROCEDURES and PARAMETERS** (Work with the applicator on the pain points with small circular movements)
- Pressure Intensity _1.6_ BAR (1.0 to 10)
- Pulses _2000_ (500 to 3000)
- Frequency _16_ Hz (3 to 16)
- Type of Transmitter _____ (Red R40) _✓_ (Black D20) _____ (Other)

Levine Patient WD (Claim No. 0729786045)

**PROCEDURES and PARAMETERS** (Work with the applicator on the pain points with small circular movements)
- Pressure Intensity _1.0 - 1.1_ BAR (1.0 to 10)
- Pulses _2000_ (500 to 3000)
- Frequency _16_ Hz (3 to 16)
- Type of Transmitter _____ (Red R40) _✓_ (Black D20) _____ (Other)

Levine Patient SG (Claim No. (0697954212)

**PROCEDURES and PARAMETERS** (Work with the applicator on the pain points with small circular movements)
- Pressure Intensity _10-11_ BAR (1.0 to 10)
- Pulses _2000_ (500 to 3000)
- Frequency _14_ Hz (3 to 16)
- Type of Transmitter _____ (Red R40) _✗_ (Black D20) _____ (Other)

Kriegel Patient MZ (Claim No. 0716311277)

PROCEDURES and PARAMETERS (Work with the applicator on the pain points with small circular movements)
- Pressure Intensity _1.0_ BAR (1.0 to 10)
- Pulses _2000_ (500 to 3000)
- Frequency _16_ Hz (3 to 16)
- Type of Transmitter _____ (Red R40) _✗_ (Black D20) _____ (Other)

Kriegel Patient AS (Claim No. 0716912100)

**PROCEDURES and PARAMETERS** (Work with the applicator on the pain points with small circular movements)
- Pressure Intensity _1.0_ BAR (1.0 to 10)
- Pulses _2000_ (500 to 3000)
- Frequency _16_ Hz (3 to 16)
- Type of Transmitter _____ (Red R40) _✓_ (Black D20) _____ (Other)

Kriegel Patient JT (Claim No. 0722880754)

**PROCEDURES and PARAMETERS** (Work with the applicator on the pain points with small circular movements)
- Pressure Intensity _1.0_ BAR (1.0 to 10)
- Pulses _2000_ (500 to 3000)
- Frequency _16_ Hz (3 to 16)
- Type of Transmitter _____ (Red R40) _✗_ (Black D20) _____ (Other)

### v.    Defendants' Fraudulent PENS and Shockwave Protocol

200.    Allstate maintains that the Defendants fraudulently billed Allstate in connection

with each and every claim for the Fraudulent Services. However, assuming in arguendo, the

patient's injuries were legitimate, and the Defendants had in fact performed Shockwave or PENS

on Insureds, the treatment was implemented in a manner that widely deviated from acceptable standards of care in podiatric medicine.

201.    Initially, the Defendants often failed to diagnose Insureds with a condition for which PENS or Shockwave would be an effective and appropriate treatment.

202.    For example, the Defendants routinely justified their decision to commence PENS based on assessing the patient with "chronic foot pain" and/or "Acute Leg Pain":

Levine Patient AN (Claim No. 0738698536)

A: AFTER ASSESSING MY PATIENT IT IS APPARENT, THEY HAVE:
_____ ✓ CHRONIC FOOT PAIN
_____ ACUTE LEG PAIN

P: IT IS MY RECOMMENDATION THAT SUCH A PATIENT SHOULD RECEIVE AT LEAST 2 TREATMENTS PER WEEK.  PERCUTANEOUS ELECTRO NEURO STIMULATIONS (PENS) TREATMENTS TO BE PERFORMED UP TO 1 TO 3 TIMES WEEKLY OVER THE COURSE OF 4 WEEKS.

Kriegel Patient RR (Claim No. 0727289589)

A: AFTER ASSESSING MY PATIENT IT IS APPARENT, THEY HAVE:
_____ CHRONIC FOOT PAIN
_____ ACUTE LEG PAIN

P: IT IS MY RECOMMENDATION THAT SUCH A PATIENT SHOULD RECEIVE AT LEAST 2 TREATMENTS PER WEEK.  PERCUTANEOUS ELECTRO NEURO STIMULATIONS (PENS) TREATMENTS TO BE PERFORMED UP TO 1 TO 3 TIMES WEEKLY OVER THE COURSE OF 4 WEEKS.

203.    Diagnoses of "Chronic Foot Pain or "Acute Leg Pain" lack diagnostic clarity and fail to meet the standard of care of modern musculoskeletal practice which requires specific rather than descriptive diagnoses. There are many common causes of foot pain. It could be due to sprains, stress fracture, nerve problems, tendon or ligament tears, etc. The treatment for each of these conditions is different. Just reporting that a patient has foot or leg pain is not a sufficient diagnosis and justification to begin any type of treatment, including Shockwave or PENS.

204.    Even in those instances where the Defendants purported to diagnose the Insured with a specific condition, such as "plantar fasciitis" or "peroneal tendinitis", the Podiatry Providers' "treatment" so grossly deviated from acceptable medical standards, that it would have placed the patients in grave risk of prolonged and chronic pain had those conditions actually existed.

54

205.    Plantar fasciitis is a widespread podiatric condition with a well-established standard of care which involves rest, activity modification, ice, massage, oral analgesics, and stretching techniques which should be tried for several weeks. If heel pain persists, then physician-prescribed treatments such as physical therapy modalities, foot orthotics, night splinting, and corticosteroid injections should be considered. Ninety percent of patients will improve with these conservative techniques.

206.    Likewise, peroneal tendinitis is well known in podiatry with a well-established, conventional care plan which involves rest, ice, over-the-counter pain medications, and activity modifications which should be tried for several weeks. If pain persists, then physician prescribed treatment such as immobilization in a walking boot, physical therapy modalities, bracing, and foot orthotics may be considered. An MRI should be considered to rule out a peroneal tendon tear if no improvement from the above treatment is seen. Surgery is considered in cases of no improvement with the above conventional care plans or if a peroneal tendon tear is found on MRI.

207.    To the extent that Shockwave is a treatment for plantar fasciitis or peroneal tendinitis it is a last resort prior to surgery *after* conventional care has failed. PENS is not an effective treatment to for plantar fasciitis or peroneal tendinitis.

208.    Levine and Kriegel, licensed podiatrists, never attempted to administer any conventional podiatry treatment to any Insured they diagnosed with plantar fasciitis, peroneal tendinitis, or any other condition.

209.    Conversely, without any medical justification, the Podiatry Providers advised Insureds that conventional treatment was ineffective, and the *only* conservative options left for them was PENS and/or Shockwave.

210.    Representative examples are below:

(i)    Insured WD (Claim No. 0732266820) was involved in an MVA on October 11, 2023. Six days later Levine diagnosed WD with plantar fasciitis arising from the MVA and, despite having received no treatment for the condition, documented that WD's conventional treatment had failed, and their only treatment options remaining were PENS and Shockwave.

(ii)    Insured JGU (Claim No. 0708897474) was involved in an MVA on March 15, 2023. Fifteen days later, Kriegel diagnosed JGU with peroneal tendinitis arising from the MVA and, despite having received no treatment for the condition, documented that JGU's conventional treatment had failed, and their only treatment options remaining were PENS and Shockwave.

(iii)    Insured KC (Claim No. 0708897474) was involved in an MVA on March 15, 2023. Fifteen days later, Kriegel diagnosed KC with peroneal tendinitis and Achilles tendinitis arising from the MVA and, despite having received no treatment for the condition, documented that KC's conventional treatment had failed, and their only treatment options remaining were PENS and Shockwave.

(iv)    Insured DS (Claim No. 0707789418) was involved in an MVA on March 25, 2023. Approximately one month later, Kriegel diagnosed DS with peroneal tendinitis arising from the MVA and, despite having received no treatment for the condition, documented that DS's conventional treatment had failed, and their only treatment options remaining were PENS and Shockwave.

(v)    Insured SV (Claim No. 0711047266) was involved in an MVA on April 19, 2023. Approximately three weeks later, Kriegel diagnosed SV with peroneal tendinitis and plantar fasciitis arising from the MVA and, despite having received no treatment for the condition, documented that SV's conventional treatment had failed, and their only treatment options remaining were PENS and Shockwave.

(vi)    Insured RL (Claim No. 0711047266) was involved in an MVA on April 19, 2023. Less than three weeks later, Kriegel diagnosed SV with peroneal tendinitis and plantar fasciitis arising from the MVA and, despite having received no treatment for the conditions, documented that RL's conventional treatment had failed, and their only treatment options remaining were PENS and Shockwave.

(vii)    Insured KS (Claim No.  0716411277) was involved in an MVA on May 29, 2023, approximately three weeks later, Kriegel diagnosed KS with peroneal tendinitis and plantar fasciitis arising from the MVA and, despite having received no treatment for the condition, documented that KS's conventional treatment had failed, and their only treatment options remaining were PENS and Shockwave.

(viii) Insured AM (Claim No. 0716437413) was involved in an MVA on June 5, 2023. Five days later, Kriegel diagnosed AM with Achilles tendinitis and plantar fasciitis arising from the MVA and, despite having received no treatment for the conditions, documented that AM's conventional treatment had failed, and their only treatment options remaining were PENS and Shockwave.

(ix) Insured CC (Claim No. 0724992243) was involved in an MVA on July 12, 2023. Approximately two months later, absent any indication that CC sustained a foot injury, Levine diagnosed CC with plantar fasciitis and advised that conventional treatment had failed, and their only treatment options remaining were PENS and Shockwave.

(x) Insured JP (Claim No. 0722571742) was involved in an MVA on July 23, 2023. Approximately six weeks later, Levine diagnosed JP with plantar fasciitis and advised that conventional treatment had failed, and their only treatment options remaining were PENS and Shockwave.

211. These are only representative examples. In many of the claims identified in *Exhibit 1,* the Podiatry Providers falsely stated that Insureds had failed conservative care for specific conditions documented by the Podiatry Providers.

212. In addition to deviating from widely accepted standards of care in podiatric medicine, the Podiatry Providers at times included treatment recommendations that were potentially dangerous, grossly unsupported by the Insureds medical history, and beyond the scope of podiatric medicine. For example, the Podiatry Providers routinely documented that due to the phantom podiatric injury the Insured "would be an excellent candidate for a permanently implanted stimulator."

213. A permanently implanted stimulator is virtually always prescribed in the context of patients suffering from chronic and severe pain associated with the spinal cord. It is virtually non-existent in the field of podiatry and the treatment is outside the scope of a podiatrist's license and involves the surgical implantation of a stimulator into the spinal cord. Nevertheless, Kriegel and Levine routinely suggested that Insureds were "excellent" candidates for this procedure.

214.    Below are representative examples:

(i)    Insured AS (Claim No. 0716912100) was involved in an MVA on May 8, 2023. On August 1, 2023, Kriegel diagnosed AS with bilateral foot and ankle pain and documented in the treatment records that AS was an excellent candidate for a permanently implanted stimulator.

(ii)    Insured DS (Claim No. 0707789418) was involved in an MVA on March 25, 2023. On June 14, 2023, Kriegel diagnosed DS with left foot and right ankle pain and documented in the treatment records that DS was an excellent candidate for a permanently implanted stimulator.

(iii)    Insured RL (Claim No. 0711047266) was involved in an MVA on April 19, 2023. On May 9, 2023, Kriegel diagnosed RL with bilateral foot and ankle pain and documented in the treatment records that RL was an excellent candidate for a permanently implanted stimulator.

(iv)    Insured SK (Claim No. 0716411277) was involved in an MVA on May 29, 2023. On August 30, 2023, Kriegel diagnosed SK with right ankle pain and documented in the treatment records that SK was an excellent candidate for a permanently implanted stimulator.

(v)    Insured LF (Claim No. 0716437413) was involved in an MVA on June 5, 2023. On June 20, 2023, Kriegel diagnosed LF with left foot pain and documented in the treatment records that LF was an excellent candidate for a permanently implanted stimulator.

(vi)    Insured KC (Claim No. 0708897474) was involved in an MVA on April 19, 2023. On May 9, 2023, Levine diagnosed KC with left and right foot pain and documented in the treatment records that KC was an excellent candidate for a permanently implanted stimulator.

(vii)    Insured SG (Claim No. 0697954212) was involved in an MVA on December 30, 2022. On October 2, 2023, Levine diagnosed SG with left and right foot pain and documented in the treatment records that SG was an excellent candidate for a permanently implanted stimulator.

(viii)    Insured CC (Claim No. 0724992243) was involved in an MVA on July 12, 2023. On September 28, 2023, Levine diagnosed CC with left and right foot pain and documented in the treatment records that CC was an excellent candidate for a permanently implanted stimulator.

(ix)    Insured KC (Claim No. 0731901898) was involved in an MVA on October 6, 2023. On October 12, 2023, Levine diagnosed KC with left and right foot pain and documented in the treatment records that KC was an excellent candidate for a permanently implanted stimulator.

(x)    Insured AC (Claim No. 0722571742) was involved in an MVA on July 23, 2023. On October 13, 2023, Levine diagnosed AC with left and right foot pain and documented in the treatment records that AC was an excellent candidate for a permanently implanted stimulator.

215.    If a patient truly had podiatric injuries, it would be unconscionable for a licensed podiatrist to advise the patient to disregard widely accepted conventional care for unproven treatment and/or spinal surgeries. Following this treatment regime could lead to permanent injury and prolonged pain and suffering.

216.    In reality, the patients' conditions, diagnosis, and treatment were all bogus and part of a scheme solely designed by laypeople to defraud Allstate and other Insurers.

**vi.    Fraudulent and Inflated Charges for PENS and Shockwave**

217.    In addition to administering Shockwave and PENS, to the extent they were rendered at all, pursuant to kickback arrangements and fraudulent, pre-determined protocols, the Defendants otherwise fraudulently billed Allstate for services not permitted under the Fee Schedule.

218.    The Defendants originally billed Shockwave using CPT code 0101T and PENS using CPT code 64999. These are the CPT codes associated with Shockwave and PENS in the Fee Schedule. However, they are not listed in the Fee Schedule for use by a podiatrist.

219.    The Worker's Compensation Fee Schedule includes a Podiatry Fee Schedule which has six major sections- Evaluation and Management, Surgery, Radiology, Pathology and Laboratory, Medicine, and Appliances and Prostheses.

220.    Each of the six sections are preceded by introductory notes, known as "Ground Rules", which contain general information and instructions which the user of each section must be acquainted with before undertaking to use the section.

221.    Pursuant to Podiatry Fee Schedule Introduction and General Guidelines Ground Rule 16, a podiatrist may only use CPT codes contained in the Podiatry Fee Schedule for billing of treatment.

222.    CPT codes 0101T and 64999 do not appear in the Podiatry Fee Schedule. Accordingly, under the No-Fault laws, the Podiatry Providers were prohibited from submitting claims to Allstate using these codes. Nevertheless, the Defendants relied on these CPT codes to charge Allstate between $769.21 and $3,552.73 per day for purported Shockwave/PENS treatment.

223.    After learning that the CPT codes associated to the Fraudulent Services limited their ability to maximize profits from the Fraudulent Scheme, the Podiatry Providers proceeded to rebill Allstate for the same services under different CPT codes and called the new bills "corrected claims".  To account for the discrepancy between the bills, Levine and Kriegel each purported to write identical letters to the American Arbitration Association claiming to be "confused over the proper manner in which to bill this service."

224.    Examples of the Podiatry Providers submitting the same billing for the Fraudulent Services under different CPT codes are shown below:

Levine Patient WD (Claim No. 0732266820)

| Original bill submitted to Allstate, received on 11/27/2023 | | | | | | | |
|---|---|---|---|---|---|---|---|
| 10/17/23 | Facility | 11550 | 99244 - Initial Consult - Medical History, Exam, Medical Treatm | 99244 | 1 | $324.70 | $324.70 |
| 10/17/23 | Facility | 11550 | 0101T - Limb | 0101T | 1 | $700.39 | $700.39 |
| 10/17/23 | Facility | 11550 | 0101T-59 - Limb | 0101T-59 | 1 | $350.19 | $350.19 |
| 10/17/23 | Facility | 11550 | 64999 - Biowave Procedure | 64999 | 1 | $1,078.30 | $1,078.30 |
| 10/17/23 | Facility | 11550 | 64999-59 - Biowave Procedure | 64999-59 | 1 | $539.15 | $539.15 |
| 10/17/23 | Facility | 11550 | 99070 - Biowave Percutaneous Electrode Arrays | 99070 | 2 | $280.00 | $560.00 |

| Corrected bill submitted to Allstate, received on 3/6/2024 | | | | | | | |
|---|---|---|---|---|---|---|---|
| 10/17/23 | Facility | 11550 | 99244 - Initial Consult - Medical History, Exam, Medical Treatm | 99244 | 1 | $324.70 | $324.70 |
| 10/17/23 | Facility | 11550 | 20999 Unlisted proc.,musculoskeletal system, General | 20999 | 1 | $700.39 | $700.39 |
| 10/17/23 | Facility | 11550 | 20999-59 Unlisted proc., musculoskeletal system, General | 20999-59 | 1 | $350.19 | $350.19 |
| 10/17/23 | Facility | 11550 | 28899 Foot or Toes Biowave BR | 28899 | 1 | $1,078.30 | $1,078.30 |
| 10/17/23 | Facility | 11550 | 27899-59 Leg or Ankle Biowave BR | 27899-59 | 1 | $539.15 | $539.15 |
| 10/17/23 | Facility | 11550 | 99070 - Biowave Percutaneous Electrode Arrays | 99070 | 2 | $280.00 | $560.00 |

Kriegel Patient RK (Claim No. 0699416277)

| Original bill submitted to Allstate, received on 4/25/2023 | | | | | | |
|---|---|---|---|---|---|---|
| 03/08/23 | Facility | 11235 | 99243 - Initial Consult - Medical History, Exam, Medical Treatm | 99243 | 1 | $248.34 | **$248.34** |
| 03/08/23 | Facility | 11235 | 0101T - Plantar fasciitis (Right) | 0101T | 1 | $700.39 | **$700.39** |
| 03/08/23 | Facility | 11235 | 0101T-59 - Plantar fasciitis (Left) | 0101T-59 | 1 | $350.19 | **$350.19** |

| Corrected bill submitted to Allstate, received on 2/13/2024 | | | | | | |
|---|---|---|---|---|---|---|
| 03/08/23 | Facility | 11235 | 99243 - Initial Consult - Medical History, Exam, Medical Treatm | 99243 | 1 | $248.34 | **$248.34** |
| 03/08/23 | Facility | 11235 | 20999 Unlisted proc.,musculoskeletal system, General | 20999 | 1 | $700.39 | **$700.39** |
| 03/08/23 | Facility | 11235 | 20999-59 Unlisted proc., musculoskeletal system, General | 20999-59 | 1 | $350.19 | **$350.19** |

| Corrected bill uploaded by Defendant to AAA on 2/14/2024 | | | | | | |
|---|---|---|---|---|---|---|
| 03/08/23 | Facility | 11235 | 99243 - Initial Consult - Medical History, Exam, Medical Treatm | 99243 | 1 | $248.34 | **$248.34** |
| 03/08/23 | Facility | 11235 | 20999 Unlisted proc.,musculoskeletal system, General | 20999 | 1 | $700.39 | **$700.39** |
| 03/08/23 | Facility | 11235 | 20999-59 Unlisted proc., musculoskeletal system, General | 20999-59 | 1 | $350.19 | **$350.19** |

225. In their "corrected claims," the Defendants attempted to use improper and backdoor means to induce Allstate to pay for the alleged Shockwave and PENS treatment.

226. In contravention of the Fee Schedule, the Podiatry Providers kept on purporting to provide the Shockwave and PENs but re-assigned them new CPT codes from within the Podiatry Fee Schedule.

227. Specifically, Defendants changed the Shockwave billing from CPT code 0101T to CPT code 20999 which is described in the Podiatry Fee Schedule as an "unlisted procedure, musculoskeletal system, general". PENS billing was changed from CPT code 64999 to CPT codes 27899 and/or 28899, which are described in the Podiatry Fee Schedule as unlisted procedures for the leg, ankle, foot, or toes.

228. Pursuant to the General Ground Rule 2 of the Podiatry Fee Schedule "some services performed are not described by any CPT code…[t]hese services should be reported using an unlisted code". As stated, an unlisted code is permissible only when the service is not described by any CPT code.

229. As previously addressed, Shockwave has a specific code in the Fee Schedule, CPT code 0101T, and is permitted for use only by physicians, physician assistants, and nurse practitioners. Therefore, Shockwave is not reimbursable for a podiatrist regardless of whether the

Defendants assign it CPT code 20999, or any other code contained within the Podiatry Fee Schedule.

230. Further, the Fee Schedule and CPT Assistant require that PENS be reported using CPT code 64999, Relevant portions from the AMA CPT Book are below:

## Neurostimulators (Peripheral Nerve)

Codes 64553-64595 apply to both simple and complex neurostimulators. For initial or subsequent electronic analysis and programming of neurostimulator pulse generators, see codes 95970-95975. An electrode array is a catheter or other device with more than one contact. The function of each contact may be capable of being adjusted during programming services.

▶Codes 64553, 64555, and 64561 may be used to report both temporary and permanent placement of percutaneous electrode arrays. Code 64550 describes application of surface (transcutaneous) neurostimulator (eg, TENS unit) at any anatomical site.◀

64561     sacral nerve (transforaminal placement) including image guidance, if performed

⟳ *CPT Changes: An Insider's View* 2002, 2012, 2013
⟳ *CPT Assistant* Dec 12:14, Sep 14:5, Oct 18:8

(64565 has been deleted)

(For percutaneous electrical neuromuscular stimulation or neuromodulation using needle[s] or needle electrode[s] [eg, PENS, PNT], use 64999)

231. As such, pursuant to the Fee Schedule, PENS must be billed under CPT code 64999, and it was improper for the Defendants to change the CPT code in an attempt to bring it within the Podiatry Fee Schedule.

### G. Fraudulent Billing for Supplies

232. To further inflate the already grossly inflated billing, the Defendants fraudulently billed Allstate ostensibly for "Biowave Patches" related to the PENS procedure using CPT code 99070.

233.    Pursuant to the Fee Schedule, CPT code 99070 is used to bill for supplies and materials provided by a physician or other qualified healthcare professional during a non-surgical procedure, over and above those typically included in the service.

234.    To the extent PENS was actually rendered, and any patches were used, the cost was inherent in the procedure and did not entitle the Defendants to bill separately in addition to the performance of PENS.

235.    Further, pursuant to the Fee Schedule, a provider submitting billing under CPT code 99070 is only entitled to reimbursement of the actual cost of the supplies.

236.    In connection with each PENS treatment, the Podiatrist Providers billed Allstate for two patches at a rate of $280 per patch resulting in a charge of $540 for the supplies per treatment.

237.    An example of the billing from each provider is below:

### Levine Patient KDR (Claim No. 0703283168)

| 10/13/23 | Facility | 11520 | 99244 - Initial Consult - Medical History, Exam, Medical Treatm | 99244 | 1 | $324.70 | $324.70 |
| 10/13/23 | Facility | 11520 | 64999 - Biowave Procedure | 64999 | 1 | $1,078.30 | $1,078.30 |
| 10/13/23 | Facility | 11520 | 64999-59 - Biowave Procedure | 64999-59 | 1 | $539.15 | $539.15 |
| 10/13/23 | Facility | 11520 | 99070 - Biowave Percutaneous Electrode Arrays | 99070 | 2 | $280.00 | $560.00 |

### Kriegel Patient TF (Claim No. 0714833902)

| 08/30/23 | Facility | 11235 | 99213 - Follow Up Examination | 99213 | 1 | $87.80 | $87.80 |
| 08/30/23 | Facility | 11235 | 20999 Unlisted proc., musculoskeletal system, General | 20999 | 1 | $700.39 | $700.39 |
| 08/30/23 | Facility | 11235 | 20999-59 Unlisted proc., musculoskeletal system, General | 20999-59 | 1 | $350.19 | $350.19 |
| 08/30/23 | Facility | 11235 | 28899 Foot or Toes Biowave BR | 28899 | 1 | $1,078.30 | $1,078.30 |
| 08/30/23 | Facility | 11235 | 27899-59 Leg or Ankle Biowave BR | 27899-59 | 1 | $539.15 | $539.15 |
| 08/30/23 | Facility | 11235 | 99070 - Biowave Percutaneous Electrode Arrays | 99070 | 2 | $280.00 | $560.00 |

238.    To substantiate the charge, the Podiatrist Providers each submitted an invoice from the same entity – Metro Arco Inc. – which on its face appears to show that Levine and Kriegel each purchased the patches from Metro Arco, Inc. at the same price charged to Allstate. Example of invoices is below:



# INVOICE

**DATE:** February 5, 2024
**INVOICE:** 105A

Metro Arco Inc.
13 Monroe Avenue
Bayville, NY 11709
Phone: (516) 471-1072

**Bill To:**
William Levine DPM
William Levine DPM
10 Greenbriar Lane
Prt. Washington, NY 11050
(646) 401-4134

**Ship To:**
William Levine DPM
William Levine DPM
10 Greenbriar Lane
Prt. Washington, NY 11050
(646) 401-4134

| SALESPERSON | SHIP VIA | SHIP DATE | TERMS | DUE DATE |
|---|---|---|---|---|
| Metro Arco/James Christopher | Ground | 2/8/2024 | Net 30 | 2/19/2024 |

| ID | DESCRIPTION | QUANTITY | UNIT PRICE, $ | LINE TOTAL |
|---|---|---|---|---|
| 1 | BioWave Patches | 14 | 280 | $ 3,920.00 |
| 2 | Rental Unit | 0 | 600 | $ - |



# INVOICE

**DATE:** April 7, 2023
**INVOICE:** 100

Metro Arco Inc.
13 Monroe Avenue
Bayville, NY 11709
Phone: (516) 471-1072

**Bill To:**
Jeffrey Kriegel DPM
Jeffrey Kriegel DPM
4505 Surf Avenue
Brooklyn, NY 11224
(646) 339-2180

**Ship To:**
Jeffrey Kriegel DPM
Jeffrey Kriegel DPM
4505 Surf Avenue
Brooklyn, NY 11224
(646) 339-2180

| SALESPERSON | SHIP VIA | SHIP DATE | TERMS | DUE DATE |
|---|---|---|---|---|
| Metro Arco/James Christopher | Ground | 3/23/2023 | Net 30 | 4/23/2023 |

| ID | DESCRIPTION | QUANTITY | UNIT PRICE, $ | LINE TOTAL |
|---|---|---|---|---|
| 1 | BioWave Patches | 48 | 280 | $ 13,440.00 |
| 2 | Rental Unit | 2 | 600 | $ 1,200.00 |
| 3 | Consult for Billing | 2 | 2000 | $ 4,000.00 |

239.    The fraudulent intent of the Defendants is manifested in the purported invoices. The invoice, along with the corresponding billing, was designed to deceive Allstate that "Quantity" represents the number of patches delivered, and "Unit Price" represents the cost per patch.

240.    Upon information and belief, "Quantity" does not reflect a single patch, but rather a box containing numerous patches.

241.    Accordingly, the Defendants paid a fraction of what they charged Allstate for the patches, and intentionally deceived Allstate with the invoices to pay far in excess of the permissible charges even assuming the charges were reimbursable in the first instance.

## H.  Fraudulently Charges for Services Performed by Non-Physicians Independent Contractors.

242.    As part of the Fraudulent Scheme, the Defendants falsely represented that the services were performed by Kriegel and Levine personally, when they were in fact performed, to the extent performed at all, by non-physician independent contractors.

243.    On each and every NF-3 Claim Form submitted to Allstate, the Defendants fraudulently represented that the services were performed by Levine or Kriegel as the "Owner" of the Podiatry Providers. No other individual is disclosed as the treating provider and the "employee", and "independent contractor" sections are left blank. Below are representative examples:

Levine Patient JG (Claim No. 0721390516)

| 16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING: | | | | | |
|---|---|---|---|---|---|
| | | | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO. | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| William Michael Levine, DPM | | N005003-01 | | | OWNER |

Kriegel Patient DS (Claim No. 0707789418)

| 16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING: | | | | | |
|---|---|---|---|---|---|
| | | | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO. | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| Dr. Jeffrey Kriegel, PM | | N004526-01 | | | OWNER |

244.    To further the deception, every treatment record, claim form, and insurance documentation submitted in association with the claims for the Fraudulent Services purport to be hand signed by Kriegel or Levine, but many of these signatures were a stamped signature and/or photocopy.

245.    For example, the below referenced stamps and/or photocopies are found across Levine's claims submissions:



*Stamped Signature #1*

*Stamped Signature #2*

*Stamped Signature #3*

*Stamped Signature #4*

246.    Likewise, the below referenced stamps and/or photocopies were used across

Kriegel's claim submissions:



247.    Moreover, the fact that the services were never performed or supervised by Levine

or Kriegel is evidenced by the following:

(i)    In connection with virtually every claim for the Fraudulent Services, the
Podiatry Providers submitted a patient consent form permitting "a physician,
and/or mid-level provider (Nurse practitioners, Physician Assistant, or
Clinical Nurse Specialist) to conduct the PENS and Shockwave treatment.
Notably absent from this list is a podiatrist.

(ii)    Although Levine and Kriegel purport to be the sole treating providers, the
medical templates contain directives to the individual conducting the services,

such as directions on how to perform Shockwave, or restrictions on how to use the treatment template.

(iii) There is no signed record by Levine or Kriegel of actually performing any Shockwave or PENS. Instead, the records consistently refer to Levine and Kriegel as the "referring provider".

(iv) Levine's and Kriegel's purported medical justification for the Fraudulent Services cite to medical authorities for treatment of injuries (e.g. elbow, shoulder, low back) not involving podiatric medicine.

(v) The patient sign-in sheet with Defendants letterhead referenced orthopedic services.

248. As an alternative to misrepresenting that Kriegel or Levine performed the services personally, and despite contradicting themselves, the Kriegel Practice suggested in verification responses to Allstate that the services were performed by W-2 employees. However, this was impossible.

249. The Levine Practice and the Kriegel Practice each billed Allstate under a tax identification number associated with the personal social security numbers of Levine or Kriegel. Social security numbers are used to identify individual persons, while employer identification numbers are used to identify employers. _see_ 26 CFR 301.6109-1 [a] [1] [ii]).

250. Under the No-Fault Law, an individual billing under their personal social security numbers cannot seek reimbursement for services performed by any other person. See Hu-Nam-Nam v New York Cent. Mut. Fire Ins. Co., N.Y.S.3d 384, 385 (App Term 2d 2016).

251. Since Kriegel Practice and Levine Practice billed Allstate under their social security numbers, they could not have any employees and could not issue W-2, Wage and Tax Statements.

252. Nevertheless, in response to verification requests from Allstate, the Kriegel Practice produced W-2's for Levine and other individuals believed to be Shockwave "technicians". The W-2's were redacted to make it appear that they were issued by the Kriegel Practice, but in reality

they were issued by a different entity, rendering the listed individuals as independent contractors of the Kriegel Practice.

253.    The Fraudulent Services, to the extent provided at all, were performed by individuals under the control of the John Doe Defendants and were not employed by Levine, Kriegel, or the Podiatry Providers, and therefore the Defendants never had any right to bill or to collect No-Fault Benefits for their services. The misrepresentations and acts of fraudulent concealment outlined in this Complaint were consciously designed to mislead Allstate into believing that it was obligated to pay the claim submissions.

### III.    The Fraudulent Charges the Defendants Submitted or Caused to be Submitted to Allstate

254.    To support their fraudulent charges, the Defendants systematically submitted, or caused to be submitted, to Allstate, documentation that consisted of NF-3 Claim Forms, HCFA-1500 Claim Forms, medical records, Assignments of Benefits, referrals, correspondences, and other supporting documentation (hereinafter, the "Claims Submissions"), which were materially false and/or misleading, to obtain payment for services they were never entitled to receive. The Claims Submissions consistently misrepresented that Levine or Kriegel had performed the Fraudulent Services.  In addition, the Claims Submissions consistently misrepresented that Levine and Kriegel's name and license, as well as the tax identification numbers of the Podiatry Providers, were being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. § 65-3.16(a)(12).

255.    In reality, neither Levine or Kriegel performed these services, and the Podiatry Providers were unlawfully and secretly operated, managed and controlled by the John Doe Defendants.

256.    Furthermore, the services were rendered, to the extent that they were rendered at all, by unlicensed individuals and/or non-podiatrists that were not employed by Levine, Kriegel, or the Podiatry Providers, thereby rendering them ineligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11.

257.    The Claims Submissions that Defendants submitted to Allstate uniformly falsified patients' conditions and materially misrepresented that the Fraudulent Services were medically necessary and rendered in accordance with generally accepted standards of medical care. Instead, the services that were provided, to the extent they were provided at all, were not based upon legitimate medical decision-making by licensed healthcare professionals.

258.    Furthermore, the Claims Submissions that were submitted, or caused to be submitted to Allstate, concealed that the services were provided, to the extent provided at all, pursuant to illegal kickback and referral arrangements that the John Doe Defendants orchestrated with third parties.

259.    Finally, Defendants materially misrepresented that the Podiatry Providers were in compliance with pertinent laws and regulations and therefore were eligible to collect No-Fault Benefits, when in fact they were not.

## IV.    Defendants' Fraudulent Concealment and Allstate's Justifiable Reliance

260.    The Defendants were under a legal and ethical obligation to act with honesty and integrity. Furthermore, Levine and Kriegel, as a duly licensed podiatrists, are required to act in accordance with their oaths as licensed medical professionals.

261.    The Defendants participated in a complex and systematic plan under which they knowingly misrepresented and concealed facts related to the Fraudulent Scheme in order to evade

detection and induce Allstate to make payments to the Podiatry Providers which Allstate was never required to make, and Defendants were never entitled to receive.

262.    The Defendants knowingly misrepresented and concealed facts related to Levine and Kriegel's management, operation, and control of their respective practices from Allstate. Documents submitted to Allstate falsely reflect that Levine and Kriegel solely managed, operated and controlled their respective practices.

263.    The Defendants knowingly misrepresented and concealed facts related to Levine and Kriegel's lack of participation in the performance of the Fraudulent Services, that the services were medically unnecessary, and were rendered pursuant to predetermined treatment protocols not based on the conditions of the Insureds.

264.    Defendants further knowingly misrepresented and concealed facts related to the employment status of the individuals who performed the Fraudulent Services to prevent Allstate from discovering that these services were non-reimbursable, as they were performed by independent contractors.

265.    Further, the Defendants concealed the fact that Allstate insureds were procured by the Defendants pursuant unlawful financial arrangements entered into with third parties.

266.    Pursuant to the No-Fault Laws, Allstate has a contractual obligation to verify and/or process claims in a prompt and fair manner, within thirty days. Defendants' conduct described herein was done intentionally and with purpose to evade detection and induce Allstate to make payments for the Fraudulent Services. When making payments to the Podiatry Providers, Allstate justifiably relied on the documents submitted because Defendants went through great lengths to ensure that the Claims Submissions appeared facially valid.

71

267.    Due to the great lengths that the Defendants took to misrepresent and conceal their fraudulent acts, Allstate did not discover, and could not have reasonably discovered, that their damages were the result of Defendants' intentional conduct, until shortly before the filing of this Complaint.

268.    As a result of the Defendants' unlawful conduct, which violated New York and federal laws, Allstate was injured in their business and property, in the amount of $86,176.77.

**AS AND FOR A FIRST CAUSE OF ACTION**

**Podiatry Provider Enterprise**

**Against Levine, Kriegel, and the John Doe Defendants**

**(Violation of RICO, 18 U.S.C. § 1962(c))**

269.    Allstate re-alleges, re-pleads and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

270.    The Levine Practice and the Kriegel Practice together constitute an association-in-fact enterprise (hereinafter, the "Podiatry Provider Enterprise"), as defined by 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

271.    The members of the Podiatry Provider Enterprise are separate business entities, with different names and tax identifications numbers, who associated together as an ongoing and continuing unit, sharing the same common purpose of furthering a healthcare fraud scheme against Allstate, and other insurers. The Levine Practice and the Kriegel Practice, each operated in a materially identical fraudulent manner, and jointly and purposefully orchestrated their submission of fraudulent claims to Allstate and other insurers to minimize the duration of time and volume of billing submitted through any single member in an attempt to avoid attracting the attention and scrutiny of Allstate and other insurers to the volume of billing and the pattern of fraudulent charges originating from any individual name. As such, the carrying out of this scheme would be beyond

the capacity of each member of the Podiatry Provider Enterprise acting individually or without the aid of each other.

272.   At all times relevant to this Complaint, Levine, Kriegel and the John Doe Defendants were "persons" employed by and/or associated with the Podiatry Provider Enterprise within the meaning of 18 U.S.C § 1961(3).

273.   Levine, Kriegel and the John Doe Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of the Podiatry Provider Enterprise's affairs through a pattern of racketeering activity as defined in 18 U.S.C. § 1962(c) consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, by submitting, or causing to be submitted, through the U.S. Mail, hundreds of fraudulent claims to Allstate seeking payments for services on behalf of the Levine Practice and the Kriegel Practice knowing that they were not reimbursable under the No- Fault laws. The scheme included:

(i)   Submitting false and fraudulent claims attesting that the Levine Practice and the Kriegel Practice, were lawfully operated, managed and controlled by a licensed podiatrist, when in fact they were being operated, managed and controlled by the unlicensed John Doe Defendants for purposes of effectuating a large-scale health insurance fraud scheme against Allstate, and other New York automobile insurers.

(ii)   Submitting false and fraudulent claims that concealed from Allstate that the medical services provided by the Levine Practice and the Kriegel Practice, to the extent provided at all, were excessive, not medically necessary, and rendered according to pre-determined treatment protocols that were not based on medical decision-making.

(iii)   Submitting false and fraudulent claims that misrepresented the nature and extent of the healthcare services that were actually provided to Allstate's insureds by the Levine Practice and the Kriegel Practice.

(iv)   Submitting false and fraudulent claims that concealed from Allstate that Allstate's insureds were procured through unlawful referral arrangements.

(v)   Submitting false and fraudulent claims that misrepresented that Levine or Kriegel performed the services when in fact the services were administered by independent contractors or had not been administered at all.

274.     The Podiatry Provider Enterprise has been engaged in the scheme since no later than 2023. The pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future as the members of the Podiatry Provider Enterprise continue to attempt collection on the fraudulent billing submitted through them until the present day. The Podiatry Provider Enterprise members were unlawfully organized; never performed any legitimate medical treatments; never conducted any legitimate business activities; and never have been eligible to bill for No-Fault Benefits. The Podiatry Provider Enterprise exists for purposes of racketeering activity inasmuch as acts of mail fraud are essential for it to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

275.     A representative sample of the fraudulent charges submitted to Allstate that comprise, in part, the pattern of racketeering activities identified through the date of this Complaint are described, in part, in the chart annexed hereto as *Exhibit 1*. All of the fraudulent charges identified in *Exhibit 1* were submitted to Allstate through the U.S. Mail.

276.     The Defendants knew that two or more mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to those mailings identified in the chart annexed hereto as *Exhibit 2*.

277.     The Podiatry Provider Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e. the submission of the fraudulent bills to Allstate and other insurers), by creating and maintaining patient files and other records, and by negotiating and executing various contracts

and/or verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services were also used to generate payments from insurance companies to support all of the aforesaid functions.

278.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $86,176.77 pursuant to the fraudulent bills submitted by Levine, Kriegel, and the John Doe Defendants through the Podiatry Provider Enterprise.

279.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION

### Podiatry Provider Enterprise

### Against Levine, Kriegel, and the John Doe Defendants

### (Violation of RICO, 18 U.S.C. § 1962(d))

280.    Allstate re-alleges, re-pleads and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

281.    The Podiatry Provider Enterprise is an association-in-fact enterprise, as defined by 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

282.    At all times relevant to this Complaint, Levine, Kriegel, and the John Doe Defendants were "persons" employed by and/or associated with the Podiatry Provider Enterprise within the meaning of 18 U.S.C § 1961(3).

283.    Levine, Kriegel and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Podiatry Provider Enterprise affairs through a pattern of racketeering activity as defined in 18 U.S.C. §

1962(c) consisting of repeated violations of the federal mail fraud statute,  18 U.S.C. § 1341, by submitting, or causing to be submitted, through the U.S. Mail, hundreds of fraudulent claims to Allstate seeking payments for services on behalf of the Levine Practice and the Kriegel Practice knowing that they were not reimbursable under the No- Fault Law. The scheme included:

(i)   Submitting false and fraudulent claims attesting that the Levine Practice and the Kriegel Practice were lawfully operated, managed and controlled by a licensed podiatrist, when in fact they were being operated, managed and controlled by the unlicensed John Doe Defendants for purposes of effectuating a large-scale health insurance fraud scheme against Allstate, and other New York automobile insurers.

(ii)  Submitting false and fraudulent claims that concealed from Allstate that the medical services provided the Levine Practice and the Kriegel Practice, to the extent provided at all, were excessive, not medically necessary, and rendered according to pre-determined treatment protocols that were not based on medical decision-making.

(iii) Submitting false and fraudulent claims that misrepresented the nature and extent of the healthcare services that were actually provided to Allstate's insureds by the Levine Practice and the Kriegel Practice.

(iv)  Submitting false and fraudulent claims that concealed from Allstate that the Allstate's insureds were procured through unlawful referral arrangements.

(v)   Submitting false and fraudulent claims that misrepresented that Levine or Kriegel performed the services when in fact the services were administered by independent contractors or had not been administered at all.

284.   A representative sample of the fraudulent charges submitted to Allstate that comprise, in part, the pattern of racketeering activities identified through the date of this Complaint are described, in part, in the chart annexed hereto as *Exhibit 1.*

285.   Levine, Kriegel and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e. to defraud Allstate and other insurers of money) by submitting or facilitating the submission of fraudulent charges to Allstate.

286.   Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $86,176.77 pursuant to the fraudulent bills submitted by Levine, Kriegel and the John Doe Defendants through the Podiatry Provider Enterprise.

287. By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION

### Levine Enterprise

### Against Levine and the John Doe Defendants

### (Violation of RICO, 18 U.S.C. § 1962(c))

288. Allstate re-alleges, re-pleads and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

289. The Levine Practice is an ongoing "enterprise", as defined by 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

290. At all times relevant to this Complaint, Levine and the John Doe Defendants were "persons" employed by and/or associated with the Levine Practice within the meaning of 18 U.S.C § 1961(3).

291. Levine and the John Doe Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of the Levine Practice's affairs through a pattern of racketeering activity as defined in 18 U.S.C. § 1962(c) consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, by submitting, or causing to be submitted, through the U.S. Mail, fraudulent claims to Allstate seeking payments for services on behalf of the Levine Practice knowing that it was not reimbursable under the No- Fault laws. The scheme included:

> (i)     Submitting false and fraudulent claims attesting that the Levine Sole Proprietorship was lawfully operated, managed and controlled by a licensed podiatrist, when in fact it was being operated, managed and controlled by the unlicensed John Doe Defendants for purposes of effectuating a large-scale health insurance fraud scheme against Allstate, and other New York automobile insurers.

(ii)    Submitting false and fraudulent claims that concealed from Allstate that the medical services provided by the Levine Sole Proprietorship, to the extent provided at all, were excessive, not medically necessary, and rendered according to a pre-determined treatment protocol that is not based on medical decision-making.

(iii)    Submitting false and fraudulent claims that misrepresented the nature and extent of the healthcare services that were actually provided to Allstate's insureds by the Levine Sole Proprietorship.

(iv)    Submitting false and fraudulent claims that concealed from Allstate that the Allstate's insureds were procured through unlawful referral arrangements.

(v)    Submitting false and fraudulent claims that misrepresented that Levine performed the services when in fact the services were administered by independent contractors or had not been administered at all.

292.    A representative sample of the fraudulent charges submitted to Allstate that comprise, in part, the pattern of racketeering activities identified through the date of this Complaint are described, in part, in the chart annexed hereto as *Exhibit 1*. All of the fraudulent charges identified in *Exhibit 1* were submitted to Allstate through the U.S. Mail.

293.    The Defendants knew that two or more mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to those mailings identified in the chart annexed hereto as *Exhibit 2*.

294.    The pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future as the Levine Sole Proprietorship continues to attempt collection on the fraudulent billing submitted through them until the present day. The Levine Sole Proprietorship was unlawfully organized, never performed any legitimate medical treatments, never conducted any legitimate business activities, and never has been eligible to bill for No-Fault Benefits. The Levine Sole Proprietorship exists for purposes of racketeering activity inasmuch as acts of mail fraud are essential for it to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

295.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $22,499.16 pursuant to the fraudulent bills submitted by Levine and the John Doe Defendants through the Levine Sole Proprietorship.

296.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION

### Levine Enterprise

### Against Levine and the John Doe Defendants

### (Violation of RICO, 18 U.S.C. § 1962(d))

297.    Allstate re-alleges, re-pleads and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

298.    The Levine Sole Proprietorship is an ongoing "enterprise", as defined by 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

299.    At all times relevant to this Complaint, Levine and the John Doe Defendants were "persons" employed by and/or associated with the Levine Sole Proprietorship within the meaning of 18 U.S.C § 1961(3).

300.    Levine and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Levine Sole Proprietorship's affairs through a pattern of racketeering activity as defined in 18 U.S.C. § 1962(c) consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, by submitting, or causing to be submitted, through the U.S. Mail, fraudulent claims to Allstate seeking payments for services on behalf of the Levine Sole Proprietorship knowing that they were not reimbursable under the No-Fault laws. The scheme included:

(i)     Submitting false and fraudulent claims attesting that the Levine Sole Proprietorship was lawfully operated, managed and controlled by a licensed podiatrist, when in fact they were being operated, managed and controlled by the unlicensed John Doe Defendants for purposes of effectuating a large-scale health insurance fraud scheme against Allstate, and other New York automobile insurers.

(ii)    Submitting false and fraudulent claims that concealed from Allstate that the medical services provided by the Levine Sole Proprietorship to the extent provided at all, were excessive, not medically necessary, and rendered according to a pre-determined treatment protocol that is not based on medical decision-making.

(iii)   Submitting false and fraudulent claims that misrepresented the nature and extent of the healthcare services that were actually provided to Allstate's insureds by the Levine Sole Proprietorship.

(iv)    Submitting false and fraudulent claims that concealed from Allstate that the Allstate's insureds were procured through unlawful referral arrangements.

(v)     Submitting false and fraudulent claims that misrepresented that Levine performed the services when in fact the services were administered by independent contractors or had not been administered at all.

301.    A representative sample of the fraudulent charges submitted to Allstate that comprise, in part, the pattern of racketeering activities identified through the date of this Complaint are described, in part, in the chart annexed hereto as *Exhibit 1*.

302.    Levine and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e. to defraud Allstate and other insurers of money) by submitting or facilitating the submission of fraudulent charges to Allstate.

303.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $22,499.16 pursuant to the fraudulent bills submitted by Levine and the John Doe Defendants through the Levine Practice.

304.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION

### Against the Levine Practice, Levine and the John Doe Defendants

### (Common Law Fraud)

305.    Allstate re-alleges, re-pleads and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

306.    As described herein, the Levine Practice, Levine and the John Doe Defendants, schemed to defraud and defrauded Allstate by intentionally and knowingly making material misrepresentations of fact and concealing material facts from Allstate in the submissions of fraudulent claims on behalf of the Levine Practice, in which they seek payment for the Fraudulent Services.

307.    These fraudulent and material misrepresentations of fact and acts of concealment, starting no later than 2023, included, but are not limited to: (i) that the Levine Practice is lawfully operated, managed and controlled by Levine, thereby making it eligible for payment pursuant to 11 N.Y.C.R.R. § 65-3.16(a)(12), when in reality the Levine Practice was secretly and unlawfully operated, managed and controlled by the John Doe Defendants, rendering it ineligible for No-Fault reimbursement; (ii) that Levine performed the Fraudulent Services, when in fact he virtually never practiced through the Levine Practice; (iii) that the services billed for by the Levine Practice, were medically necessary and warranted by the condition of the Allstate insured, when in fact the Fraudulent Services were excessive, not medically necessary, and were rendered pursuant to predetermined treatment protocols designed to unjustly enrich the Levine Practice, Levine, and the John Doe Defendants;  (iv) that the Fraudulent Services were coded and charged in accordance with the Fee Schedule, when in fact the charges were unbundled, inflated, overcharged, and did not accurately reflect the underlying services rendered to the Allstate insureds; (v) that the Levine Practice obtained its patients in a legitimate manner, when in fact, patients were steered to it as

part of an illegal financial arrangement; (vi) that the services were performed by Levine, when in fact they were performed by non-physician independent contractors, to the extent performed at all; (vii) that the Fraudulent Services were actually provided, when in fact they were not; and (viii) that the Levine Practice was otherwise in compliance with pertinent laws and regulations and therefore eligible to collect No-Fault Benefits, when it fact it was not.

308.    The Levine Practice, Levine and the John Doe Defendants intentionally and knowingly made the above-referenced material misrepresentations and concealed material facts in a contrived, calculated effort to give the services a false appearance of validity when they knew the services were not reimbursable under the No-Fault laws. The Levine Practice, Levine, and the John Doe Defendants conduct induced Allstate to pay charges submitted by, or on behalf of the Levine Practice that it was never entitled to receive.

309.    Allstate did in fact reasonably and justifiably rely, to its detriment, upon the facially valid claims submissions by the Levine Practice. As a proximate result of the false and fraudulent claim submissions submitted by the Levine Practice, Allstate has been injured in its business and property, in that it has paid at least $22,499.16.

310.    Allstate would not have issued payment, or have been obligated to issue payment, to the Levine Practice for the Fraudulent Services but for the concealment and intentional and material misrepresentations made by the Levine Practice, Levine, and the John Doe Defendants.

311.    The Levine Practice, Levine and the John Doe Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

312.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SIXTH CAUSE OF ACTION

### Against the Levine Practice, Levine and John Doe Defendants

### (Unjust Enrichment)

313.    Allstate re-alleges, re-pleads and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

314.    As set forth above, the Levine Practice, Levine and the John Doe Defendants have engaged in unjust, improper, and/or unlawful acts, all to the detriment and harm of Allstate.

315.    When Allstate reimbursed the Levine Practice, by paying the bills and charges submitted by or on behalf of the Levine Practice, it reasonably believed that it was legally obligated to make such payments based on the unjust, improper and/or unlawful acts of the Levine Practice, Levine, and the John Doe Defendants.

316.    The Levine Practice, Levine, and the John Doe Defendants' retention of Allstate's payments violates the fundamental principles of justice, equity and good conscience.

317.    By reason of the acts described above, the Levine Practice, Levine and the John Doe Defendants' have been unjustly enriched in the amount to be determined at trial, but at a minimum, the sum of $22,499.16.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### Kriegel Practice Enterprise

### Against Kriegel and John Doe Defendants

### (Violation of RICO, 18 U.S.C. § 1962(c))

318.    Allstate re-alleges, re-pleads and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

319.    The Kriegel Practice is an ongoing "enterprise", as defined by 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

320.    At all times relevant to this Complaint, Kriegel and the John Doe Defendants were "persons" employed by and/or associated with the Kriegel Practice within the meaning of 18 U.S.C § 1961(3).

321.    Kriegel and the John Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of the Kriegel Practices affairs through a pattern of racketeering activity as defined in 18 U.S.C. § 1962(c) consisting of repeated violations of the federal mail fraud statute,  18 U.S.C. § 1341, by submitting, or causing to be submitted, through the U.S. Mail, hundreds of fraudulent claims to Allstate seeking payments for services on behalf of the Kriegel Practice knowing that it was not reimbursable under the No- Fault laws. The scheme included:

    (i)    Submitting false and fraudulent claims attesting that the Kriegel Practice was lawfully operated, managed and controlled by a licensed podiatrist, when in fact it was being operated, managed and controlled by the unlicensed John Doe Defendants for purposes of effectuating a large-scale health insurance fraud scheme against Allstate, and other New York automobile insurers.

    (ii)    Submitting false and fraudulent claims that concealed from Allstate that the medical services provided by the Kriegel Practice, to the extent provided at all, were excessive, not medically necessary, and rendered according to a pre-determined treatment protocol that is not based on medical decision-making.

    (iii)    Submitting false and fraudulent claims that misrepresented the nature and extent of the healthcare services that were actually provided to Allstate's insureds by the Kriegel Practice.

    (iv)   Submitting false and fraudulent claims that concealed from Allstate that the Allstate's insureds were procured through unlawful referral arrangements.

    (v)   Submitting false and fraudulent claims that misrepresented that Kriegel performed the services when in fact the services were administered by independent contractors or had not been administered at all.

322.    A representative sample of the fraudulent charges submitted to Allstate that comprise, in part, the pattern of racketeering activities identified through the date of this Complaint are described, in part, in the chart annexed hereto as *Exhibit 1*. All of the fraudulent charges identified in *Exhibit 1* were submitted to Allstate through the U.S. Mail.

323.    The Defendants knew that two or more mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to those mailings identified in the chart annexed hereto as *Exhibit 2*.

324.    The pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future as the Kriegel Practice continues to attempt collection on the fraudulent billing submitted through them until the present day. The Kriegel Practice was unlawfully organized, never performed any legitimate medical treatments, never conducted any legitimate business activities, and never has been eligible to bill for No-Fault Benefits. The Kriegel Practice exists for purposes of racketeering activity inasmuch as acts of mail fraud are essential for it to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

325.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $63,677.61 pursuant to the fraudulent bills submitted by Kriegel and the John Doe Defendants through the Kriegel Practice.

326.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

**Kriegel Practice Enterprise**

**Against Kriegel and the John Doe Defendants**

**(Violation of RICO, 18 U.S.C. § 1962(d))**

327.    Allstate re-alleges, re-pleads and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

328.    The Kriegel Practice is an ongoing "enterprise", as defined by 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

329.    At all times relevant to this Complaint, Kriegel and the John Doe Defendants were "persons" employed by and/or associated with the Kriegel Practice within the meaning of 18 U.S.C § 1961(3).

330.    Kriegel and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Kriegel Practices affairs through a pattern of racketeering activity as defined in 18 U.S.C. § 1962(c) consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, by submitting, or causing to be submitted, through the U.S. Mail, hundreds of fraudulent claims to Allstate seeking payments for services on behalf of the Kriegel practice knowing that they were not reimbursable under the No- Fault Law. The scheme included:

(i)    Submitting false and fraudulent claims attesting that the Kriegel Practice was lawfully operated, managed and controlled by a licensed podiatrist, when in fact they were being operated, managed and controlled by the unlicensed John Doe Defendants for purposes of effectuating a large-scale health insurance fraud scheme against Allstate, and other New York automobile insurers.

86

    (ii)    Submitting false and fraudulent claims that concealed from Allstate that the medical services provided by the Kriegel Practice to the extent provided at all, were excessive, not medically necessary, and rendered according to a pre-determined treatment protocol that is not based on medical decision-making.

    (iii)   Submitting false and fraudulent claims that misrepresented the nature and extent of the healthcare services that were actually provided to Allstate's insureds by the Kriegel Practice.

    (iv)   Submitting false and fraudulent claims that concealed from Allstate that the Allstate's insureds were procured through unlawful referral arrangements.

    (v)    Submitting false and fraudulent claims that misrepresented that Kriegel performed the services when in fact the services were administered by independent contractors or had not been administered at all.

331.    A representative sample of the fraudulent charges submitted to Allstate that comprise, in part, the pattern of racketeering activities identified through the date of this Complaint are described, in part, in the chart annexed hereto as *Exhibit 1*.

332.    Kriegel and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e. to defraud Allstate and other insurers of money) by submitting or facilitating the submission of fraudulent charges to Allstate.

333.    Allstate has been injured in its business and property by reason of the above-described conduct in that it has paid at least $63,677.61 pursuant to the fraudulent bills submitted by Kriegel and the John Doe Defendants through the Kriegel Practice.

334.    By reason of its injury, Allstate is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A NINTH CAUSE OF ACTION

### Against the Kriegel Practice, Kriegel and John Doe Defendants

### (Common Law Fraud)

335.    Allstate re-alleges, re-pleads and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

336.    As described herein, the Kriegel Practice, Kriegel, and the John Doe Defendants, schemed to defraud and defrauded Allstate by intentionally and knowingly making material misrepresentations of fact and concealing material facts from Allstate in the submissions of hundreds of fraudulent claims on behalf of the Kriegel Practice, in which they seek payment for the Fraudulent Services.

337.    These fraudulent and material misrepresentations of fact and acts of concealment include, but are not limited to: (i) that the Kriegel Practice is lawfully operated, managed and controlled by Kriegel, thereby making it eligible for payment pursuant to 11 N.Y.C.R.R. § 65-3.16(a)(12), when in reality the Kriegel Practice was secretly and unlawfully operated, managed and controlled by the John Doe Defendants, rendering it ineligible for No-Fault reimbursement; (ii) that Kriegel performed the Fraudulent Services, when in fact he virtually never practiced through the Kriegel Practice; (iii) that the services billed for by the Kriegel Practice, were medically necessary and warranted by the condition of the Allstate insured, when in fact the Fraudulent Services were excessive, not medically necessary, and were rendered pursuant to predetermined treatment protocols designed to unjustly enrich the Kriegel Practice, Kriegel, and the John Doe Defendants;  (iv) that the Fraudulent Services were coded and charged in accordance with the Fee Schedule, when in fact the charges were unbundled, inflated, overcharged, and did not accurately reflect the underlying services rendered to the Allstate insureds; (v) that the Kriegel Practice obtained its patients in a legitimate manner, when in fact, patients were steered to it as

part of an illegal financial arrangement; (vi) that the services were performed by Kriegel, when in fact they were performed by non-physician independent contractors, to the extent performed at all; (vii) that the Fraudulent Services were actually provided, when in fact they were not; and (viii) that the Kriegel Practice was otherwise in compliance with pertinent laws and regulations and therefore eligible to collect No-Fault Benefits, when it fact it was not.

338.    The Kriegel Practice, Kriegel, and the John Doe Defendants intentionally and knowingly made the above-referenced material misrepresentations and concealed material facts in a contrived, calculated effort to give the services a false appearance of validity when they knew the services were not reimbursable under the No-Fault laws. The Kriegel Practice, Kriegel and the John Doe Defendants conduct induced Allstate to pay charges submitted by, or on behalf of the Kriegel Practice that it was never entitled to receive.

339.    Allstate did in fact reasonably and justifiably rely, to its detriment, upon the facially valid claims submissions by the Kriegel Practice.  As a proximate result of the false and fraudulent claim submissions submitted by the Kriegel Practice, Allstate has been injured in its business and property, in that it has paid at least $63,677.61.

340.    Allstate would not have issued payment, or have been obligated to issue payment, to the Kriegel Practice for the Fraudulent Services but for the concealment and intentional and material misrepresentations made by the Kriegel Practice, Kriegel and the John Doe Defendants.

341.    The Kriegel Practice, Kriegel and the John Doe Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Allstate to recover punitive damages.

342.    Accordingly, by virtue of the foregoing, Allstate is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TENTH CAUSE OF ACTION

### Against the Kriegel Practice, Kriegel and John Doe Defendants

### (Unjust Enrichment)

343.    Allstate re-alleges, re-pleads and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

344.    As set forth above, the Kriegel Practice, Kriegel, and the John Doe Defendants have engaged in unjust, improper, and/or unlawful acts, all to the detriment and harm of Allstate.

345.    When Allstate reimbursed the Kriegel Practice, by paying the bills and charges submitted by or on behalf of the Kriegel Practice, it reasonably believed that it was legally obligated to make such payments based on the unjust, improper and/or unlawful acts of the Kriegel Practice, Kriegel and the John Doe Defendants.

346.    The Kriegel Practice, Kriegel, and the John Doe Defendants' retention of Allstate's payments violates the fundamental principles of justice, equity and good conscience.

347.    By reason of the acts described above, the Kriegel Practice, Kriegel and the John Doe Defendants have been unjustly enriched in the amount to be determined at trial, but at a minimum, the sum of $63,677.61.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION

### Against The Levine Practice & The Kriegel Practice

### (Declaratory Judgment - 28 U.S.C. §§ 2201 and 2202)

348.    Allstate re-alleges, re-pleads and incorporates by reference, each and every allegation in the paragraphs above, as if set forth fully herein.

349.    To be eligible to receive assigned No-Fault Benefits, an assignee provider must adhere to all applicable New York laws that grant them the authority to provide health care services in New York. Healthcare professionals are not eligible to bill or to collect No-Fault Benefits, if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

350.    The Levine Practice and Kriegel Practice were ineligible for No-Fault Benefits and have no right to receive payment from Allstate on the unpaid billing because:

(i)    The Levine Practice and Kriegel Practice were unlawfully operated, managed and controlled by the John Doe Defendants.

(ii)    The medical services provided by the Levine Practice and Kriegel Practice to Allstate insureds, to the extent provided at all, were excessive, medically unnecessary, and rendered according to pre-determined treatment protocols that were not based on medical decision-making but designed solely to financially enrich the Defendants.

(iii)    The claim forms submitted to Allstate by (or on behalf of) the Levine Practice and the Kriegel Practice fraudulently and materially misrepresented the nature and extent of the healthcare services that were provided to Allstate insureds to wrongfully inflate charges.

(iv)    The Levine Practice and Kriegel Practice procured Allstate insureds through unlawful referral arrangements.

(v)    The Levine Practice and Kriegel Practice's claim forms fraudulently misrepresented that Levine or Kriegel provided the services when in fact, to the extent provided at all, the services were provided by non-physician independent contractors who were not employed by Levine, Kriegel, the Levine Practice, or the Kriegel Practice

351.    There is an actual and justifiable case and controversy between Allstate and the Levine Practice and Kriegel Practice, in the total amount of $619,208.32, of unpaid billing for the Fraudulent Services that were submitted to Allstate by the Defendants.

352.    The Levine Practice and Kriegel Practice continue to challenge Allstate's prior denials of its claims.

353.    The Levine Practice and Kriegel Practice continue to commence litigation in New York Civil Courts, as well as continue to file arbitrations with the American Arbitration Association, against Allstate, seeking payment for No-Fault Benefits allegedly due and owing.

354.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Levine Practice and Kriegel Practice have no right to receive payment for any pending bills and charges submitted to Allstate.

## DEMAND FOR RELIEF

355.    Pursuant to Federal Rule of Civil Procedure 38(b), Allstate demands a trial by jury.

**WHEREFORE**, Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company and Allstate Fire and Casualty Insurance Company (collectively, "Allstate"), respectfully ask that a Judgement be entered in their favor and against the Defendants, as follows:

A.  On the First Cause of Action against Defendants Levine, Kriegel and the John Doe Defendants:

   (i)    AWARD compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $86,176.77, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

   (ii)   GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

   (iii)  GRANT all other relief this Court deems just.

B.  On the Second Cause of Action against Defendants Levine, Kriegel and the John Doe Defendants:

   (i)    AWARD compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $86,176.77, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

       (ii)   GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

       (iii)   GRANT all other relief this Court deems just.

C.  On the Third Cause of Action against Defendants Levine and the John Doe Defendants:

       (i)   AWARD compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $22,499.16, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

       (ii)   GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

       (iii)   GRANT all other relief this Court deems just.

D.  On the Fourth Cause of Action against Defendants Levine and the John Doe Defendants:

       (i)   AWARD compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $22,499.16, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

       (ii)   GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

       (iii)   GRANT all other relief this Court deems just.

E.  On the Fifth Cause of Action against Defendants the Levine Practice, Levine and the John Doe Defendants:

       (i)   AWARD compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $22,499.16, together with punitive damages, costs and interest; and

       (ii)   GRANT all other relief this Court deems just.

F.  On the Sixth Cause of Action against Defendants the Levine Practice, Levine, and the John Doe Defendants:

    (i)  AWARD compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $22,499.16, together with costs and interest; and

    (ii)  GRANT all other relief this Court deems just.

G.  On the Seventh Cause of Action against Defendant Kriegel and the John Doe Defendants:

    (i)  AWARD compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $63,677.61, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

    (ii)  GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

    (iii)  GRANT all other relief this Court deems just.

H.  On the Eighth Cause of Action against Defendants Kriegel and the John Doe Defendants:

    (i)  AWARD compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $63,677.61, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

    (ii)  GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

    (iii)  GRANT all other relief this Court deems just.

I.  On the Nineth Cause of Action against Defendants the Kriegel Practice, Kriegel and the John Doe Defendants:

    (i)  AWARD compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $63,677.61, together with punitive damages, costs and interest; and

(ii)    GRANT all other relief this Court deems just.

J.  On the Tenth Cause of Action against Defendants the Kriegel Practice, Kriegel

and the John Doe Defendants:

(i)    AWARD compensatory damages in favor of Allstate in an amount to be determined at trial but in excess of $63,677.61, together with costs and interest; and

(ii)    GRANT all other relief this Court deems just.

K.  On the Eleventh Cause of Action against the Levine Practice and the Kriegel

Practice:

(i)    DECLARE, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Levine Practice and the Kriegel Practice, at all relevant times, have been unlawfully operated, managed and controlled by at least one non-physician, and otherwise operated in violation of at least one New York state and/or local licensing requirement necessary to provide professional physician services in New York; and

(ii)    DELCARE that the Levine Practice and the Kriegel Practice's activities are unlawful; and

(iii)    DECLARE that Allstate has no obligation to pay any pending, previously denied and/or future No-Fault insurance claims submitted by the Levine Practice and the Kriegel Practice; and

(iv)    GRANT all other relief this Court deems just.

[SIGNATURE PAGE FOLLOWS]

Dated: Uniondale, New York
      October 27, 2025

                  Law Offices of Camille Nanni

                  By:  */s/ Robert Quinn*
                  Robert J. Quinn, Esq.
                  Komal Keluskar, Esq.
                  1125 RXR Plaza, East Tower 11th Floor
                  Uniondale, New York 11556
                  914-620-0070

                  Counsel for Plaintiffs,

                  *Allstate Insurance Company, Allstate*
                  *Property & Casualty Insurance Company, Allstate*
                  *Fire & Casualty Insurance Company, and Allstate*
                  *Indemnity Company*

# INDEX OF EXHIBITS

**EXHIBIT 1:**   **REPRESENTATIVE SAMPLE OF FRAUDULENT CHARGES SUBMITTED TO ALLSTATE**

**EXHIBIT 2**   **REPRESENTATIVE SAMPLE OF MAILED FRAUDULENT CLAIMS**